******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* HARALAMBOS SIDIROPOULOS
## (AC 47230)

Elgo, Seeley and DiPentima, Js.

*Syllabus*

Convicted of breach of the peace in the second degree in violation of statute (§ 53a-181 (a) (5)) after an angry confrontation in a dental office, the defendant appealed. The defendant, a white man, repeatedly and loudly yelled "stupid nigger" at a multiracial dental assistant, M, while in an examination room with M. He claimed, inter alia, that the evidence was insufficient to support his conviction because the words he uttered to M constituted protected speech under the first amendment to the United States constitution and under article first, §§ 4, 5 and 14, of the Connecticut constitution. *Held*:

This court concluded that the circumstances at issue warranted a finding that the defendant's language constituted fighting words that were not protected under the first amendment and, thus, provided a sufficient basis to support the defendant's conviction, as they were likely to provoke an immediate violent reaction from a reasonable person in M's position.

The defendant's unpreserved claim that his speech was protected under article first, §§ 4, 5 and 14, of the state constitution failed under *State* v. *Golding* (213 Conn. 233), as this court applied the multifactor approach to state constitutional interpretation under *State* v. *Geisler* (222 Conn. 672) and concluded that the *Geisler* factors did not support the defendant's contention that the broader protections for speech under the state constitution extended to fighting words.

The defendant could not prevail on his unpreserved claim that § 53a-181 (a) (5) is unconstitutionally vague on its face, this court having previously found that the statute is not unconstitutionally vague, which the defendant did not challenge on appeal, and the judicial gloss courts have applied to § 53a-181 (a) (5) limits its reach to unprotected fighting words so as to ensure that it comports with constitutional requirements, which include fair notice of what is prohibited; accordingly, the defendant failed to established the existence of a constitutional violation pursuant to *Golding*.

The defendant could not prevail on his unpreserved claim that § 53a-181 (a) (5) was unconstitutionally vague as applied to his conduct, as a reasonable person in his position would have anticipated that repeatedly and loudly uttering "stupid nigger" in a confined space in which the speaker blocked the only exit for the addressee as he repeatedly shouted the racial epithet would be prohibited by the statute, and our Supreme Court's decision in *State* v. *Liebenguth* (336 Conn. 685) provided adequate warning that referring to a person by a racial slur can constitute fighting words; accordingly, because the defendant did not demonstrate that he had inadequate notice of what was prohibited under § 53a-181 (a) (5) or that he was the victim of arbitrary

and discriminatory enforcement of the statute, he failed to establish the existence of a constitutional violation pursuant to *Golding*.

Argued September 8, 2025—officially released January 20, 2026

*Procedural History*

Substitute information charging the defendant with two counts of the crime of breach of the peace in the second degree, brought to the Superior Court in the judicial district of Stamford-Norwalk and tried to the court, *Hernandez, J.*; thereafter, the court denied the defendant's motion for a judgment of acquittal; finding of guilty; subsequently, the court vacated the guilty finding as to one count of breach of the peace in the second degree and rendered judgment of guilty of one count of breach of the peace in the second degree, from which the defendant appealed to this court. *Affirmed.*

*Hope J. Estrella*, for the appellant (defendant).

*Alexander A. Kambanis*, deputy assistant state's attorney, with whom, on the brief, were *Paul J. Ferencek*, state's attorney, and *Michael C. Bivona*, assistant state's attorney, for the appellee (state).

*Opinion*

SEELEY, J. The defendant, Haralambos Sidiropoulos, appeals from the judgment of conviction, rendered following a trial to the court, of one count of breach of the peace in the second degree in violation of General Statutes §53a-181 (a) (5).[1] The defendant's conviction stems from an angry confrontation he had with a dental assistant while at a dental office. On appeal, the defendant claims that (1) the state failed to meet its burden of proof with respect to the breach of the peace charge because his

---

[1] General Statutes §53a-181 (a) provides in relevant part: "A person is guilty of breach of the peace in the second degree when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person . . . (5) in a public place, uses abusive or obscene language or makes an obscene gesture . . . . For purposes of this section, 'public place' means any area that is used or held out for use by the public whether owned or operated by public or private interests."

speech was protected under (a) the first amendment to the United States constitution and (b) article first, §§ 4, 5 and 14, of the Connecticut constitution, and (2) § 53a-181 (a) (5) is unconstitutionally vague (a) on its face and (b) as applied to the facts of the present case. We affirm the judgment of conviction.

The following evidence was presented at trial. Natascha Medina was employed as a per diem dental assistant at a Columbia Dental, P.C., office (dental office) in Norwalk. The dental office, which is located within a two-story office building, is open to the public and accepts both scheduled and walk-in emergency appointments. Several businesses besides the dental office are located inside the building.

Medina's job functions as a dental assistant included aiding a dentist during procedures, taking X-rays, and disinfecting and preparing examination rooms between patients. She was enrolled in school to become a dental hygienist, where she was trained to de-escalate dentophobia, also referred to as dental phobia.[2] Medina testified

---

[2] The Cleveland Clinic describes dentophobia as "a fear of dentists. Someone with dentophobia may have extreme anxiety at the thought of going to the dentist or while in the dentist's office." Cleveland Clinic, "Dentophobia (Fear of Dentists)," available at https://my.clevelandclinic.org/health/diseases/22594-dentophobia-fear-of-dentists (March 22, 2022) (last visited January 14, 2026).

Medina's testimony regarding her training relative to dental phobia was brief and occurred during cross-examination by defense counsel:

"Q. And . . . just a few more questions, okay. And you would agree that going to the dentist's office is a pretty nerve-wracking experience for some people, right?

"A. Yeah, there's such a thing as dental phobia.

"Q. Oh, I learned something new today. It's a little tense environment going into the dentist office, is that correct?

"A. Yeah.

"Q. Would you say it's a little nerve-wracking for some people, correct?

"A. Yes.

"Q. You mentioned earlier that [you were] trained to utilize some of the tools in the room. You mentioned to take X-rays, is that correct?

"A. Yes.

"Q. To clean and sterilize the equipment.

"A. Yes.

"Q. To keep the space generally hygienic, that's correct?

"A. Yes.

"Q. And have you received any training, or have you been aware of, you know, de-escalating this sort of dental phobia as you called it?

"A. Uhm, yeah. Not as an assistant but as a hygienist, yeah."

that she is "half Puerto Rican" and that her father is "half Italian, half Black."

On July 17, 2023, the defendant, a white man,[3] went to the dental office for an emergency appointment, complaining of light pain and swelling after his dental crown had fallen out. The receptionist, Meyely Claudio, asked the defendant to fill out paperwork while he waited to be seen. Before the defendant could complete the paperwork, Medina asked him to come into an examination room so she could perform X-rays.

Medina brought the defendant into a small examination room where he sat in a dental chair, completed the paperwork and gave Medina his dental crown. The room, measuring roughly ten feet by six feet, contains a single door, an X-ray machine on a wall, a single window, a computer with a stand, and a dental chair. Medina testified that the space feels crowded when more than two people are in the room. Medina did not feel confident in her ability to take X-rays on her own, so she asked another dental assistant for help, but the defendant did not want X-rays[4] to be taken.

The defendant then asked that Medina place his eyeglasses in a safe place for the duration of the appointment. Medina placed the defendant's eyeglasses on a computer stand where patient belongings often were kept. The defendant believed that this was an unhygienic place for his glasses and demanded that Medina move them. He was particularly upset because he felt that he had been polite. Medina then placed the eyeglasses on a piece of paper towel on a silver dentistry tray and assured the defendant that the table was clean and that it would not be used. Still believing this was an unhygienic place for his glasses, the defendant jumped up from the dental chair and began yelling at Medina. First, he angrily asked Medina, "[w]hy did you put my glasses there?," before moving to the only doorway of the room. The defendant

---

[3] See footnote 6 of this opinion.

[4] In her testimony, Medina could not recall if X-rays were taken. The defendant testified that he allowed the X-rays to be taken.

then stood in the doorway, blocking Medina's exit, and repeatedly yelled that Medina was a "stupid nigger."[5] Medina described the defendant's voice as "loud" and "intimidating . . . ." She testified that, at first, she was "in shock" and that she was "really nervous" because the defendant blocked the doorway and leaned toward her as he yelled at her. Medina estimated that the defendant is approximately six feet, three inches tall, whereas she is five feet, nine inches tall. Medina asked that the defendant stop repeating the phrase "stupid nigger," but the defendant continued to yell it. Medina cried in response. At that point, another patient, who is Hispanic and had been in the waiting room, came to the examination room. Medina testified that the patient appeared angry about the situation and told the defendant in a loud tone of voice that he needed "to calm down and stop it." The patient then escorted Medina, who was still crying, from the room.

Claudio testified that she heard the defendant repeat the epithet "twice, probably," from her receptionist's desk located approximately ten feet from the examination room and that he sounded "angry." Thereafter, the defendant left the doorway and entered the waiting room, where he continued yelling. The defendant's voice became louder as he exited the examination room. He continued yelling the " 'N' word" at Medina approximately two more times while he entered the waiting room. Other patients exited their examination rooms in response to

[5] At trial, Medina initially testified that the defendant had called her a "fucking nigger" and that he repeated those words "ten or eleven times." On cross-examination, defense counsel refreshed Medina's recollection with respect to a written statement she had given to the police, in which she stated that the defendant had called her a "stupid nigger" and that he did so "over and over again." Medina thereafter acknowledged that, in her written statement, she used the words "stupid nigger" and did not refer to a specific number of times that it was repeated by the defendant. Defense counsel then requested that Medina's written statement be introduced into evidence, for substantive purposes, as a prior inconsistent statement pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). The court admitted Medina's statement without objection by the state.

the commotion caused by the defendant. One of those patients confronted the defendant, stating, "[w]hat are you doing?"

The defendant made his way back through the waiting room while yelling, "[t]his place is bad," and, "[l]eave this place," and making "threats." He continued yelling about Medina being "stupid" and asking why she would put his glasses "there . . . ." Claudio testified that the defendant then exited the front door of the dental office after which another assistant locked the door because "we were all shocked," and "other patients in the other [examination] rooms came out because they were, like, shocked" and "couldn't believe someone was yelling." After the defendant realized that he had left his crown inside the then locked dental office, he knocked on the door loudly to retrieve it. Unsuccessful, the defendant then exited the office building and was standing on the sidewalk in front of the building when the police arrived.

The responding police officer, Officer Paul Wargo of the Norwalk Police Department, arrived at the building in which the dental office was located after receiving a call about an "unwanted guest." Wargo first encountered the defendant outside the building. A video recording from Wargo's body camera shows the defendant standing on the sidewalk looking agitated. After Wargo inquired about the situation, the defendant angrily responded that he planned to sue the dental office. Wargo then asked if the defendant knew why the officer was there, and the defendant responded, "the Black girl," before referring to Medina as a dental assistant. The defendant claimed that Medina put his glasses on the dentist's tools, which made him angry. Wargo thereafter entered the building and spoke with Medina and Claudio. Wargo asked Medina to fill out a statement form.

Wargo then exited the building to retrieve a statement form from his police vehicle and encountered the defendant a second time. Wargo informed the defendant that he would be issuing a court summons for breach of the

peace due to his conduct inside the dental office.[6] The defendant stated that he called Medina a "stupid nigger" because "the girl was stupid to me" and "she was playing nerves." After issuing the summons to the defendant, Wargo went back inside the dental office to allow Medina to complete the statement form. Wargo did not obtain a statement from any other witnesses, nor did he speak to any patients in the waiting room.

Subsequently, the defendant was charged in an information dated November 1, 2023, with two counts of breach of the peace in the second degree in violation of §53a-181 (a) (5). Specifically, count one charged that the defendant, "acting with the intent to cause inconvenience, annoyance, or alarm, used abusive language while in a public place . . . ." Count two charged, alternatively, that the defendant "recklessly created a risk of causing inconvenience, annoyance, or alarm, by using abusive language while in a public place . . . ." The defendant waived his right to a jury trial and elected a trial to the court, which took place on November 16, 2023.

In his case-in-chief, the prosecutor presented testimony from Medina, Claudio, and Wargo. First, Medina's testimony recounted her shock and upset because of the defendant's conduct. Next, Claudio's testimony recounted the reactions that she and other patients in the dental office had in response to the defendant's conduct, including that one patient had attempted to intervene. The last witness for the prosecution was Wargo, who testified about his encounter with the defendant and verified the video footage from his body camera.

After the prosecutor rested his case, defense counsel orally moved for a judgment of acquittal, arguing that the state had not met its burden of demonstrating that the defendant committed breach of the peace in the second degree as charged in the information. Specifically, defense counsel maintained that, although "nigger" is a vile, reprehensible epithet to call another individual,

---

[6] The summons that was issued to the defendant includes a "W" in the box indicating his race.

the defendant's speech was protected under the first amendment to the federal constitution. The defendant's speech did not constitute "fighting words" because it was not likely to trigger an imminent violent response by the average person in Medina's position and the defendant did not make any threats or use language that was inciting. In support of this argument, defense counsel asserted that Medina, as a dental assistant, held an "authoritative position" that required her "to exercise a higher degree of restraint." Defense counsel emphasized that neither Medina nor anyone else who witnessed the incident responded with violence to the defendant's language. Defense counsel made no argument as to whether the defendant's speech was protected under the Connecticut constitution or whether the breach of the peace statute was vague on its face or as applied to the facts of this case.

In response, the prosecutor, relying on *State* v. *Liebenguth*, 336 Conn. 685, 250 A.3d 1 (2020), cert. denied,    U.S.    , 141 S. Ct. 1394, 209 L. Ed. 2d 132 (2021), argued that the circumstances of the incident, which occurred in a small room in a dental office and involved the defendant's repeated use, in a loud tone, of the epithet, "stupid nigger," as well as his continued yelling in the waiting room causing other patients to exit their examination rooms, removed the defendant's words from first amendment protection and constituted "fighting words." The prosecutor argued that the defendant's use of the words, "stupid nigger," in a tight space would likely cause a reasonable person to react with violence, even though Medina did not actually do so.

Thereafter, the court briefly stated its decision orally on the record. Specifically, the court agreed with the state that the analysis in *Liebenguth* was the controlling law in the present case, pointing out that the circumstances at issue were "substantially more extreme" than those presented in *Liebenguth*. Therefore, the court denied the defendant's motion for a judgment of acquittal,

concluding that the defendant's statements fell outside the protection of the first amendment.

Subsequently, defense counsel called the defendant to the witness stand as the only defense witness. The defendant testified that he called Medina a "stupid nigger" more than once because he was frustrated and that he continued yelling when he left the examination room and went to the receptionist's area. Thereafter, the defense rested, and the prosecutor and defense counsel made their closing remarks. After a brief recess, the court orally rendered its decision.[7]

The court first found the state's witnesses credible and the defendant unpersuasive. Applying *Liebenguth*, the court found the defendant guilty of both counts of breach of the peace in the second degree.[8] The court initially sentenced the defendant on both counts to six months of incarceration, execution suspended, and eighteen months

---

[7] The record contains a signed transcript of the court's oral decision in compliance with Practice Book § 64-1.

[8] Specifically, the court stated: "I've had an opportunity to look at the exhibits. I've reviewed my notes and reread the information and had a chance to look over the holdings in the . . . cases provided by defense counsel. [The defendant] is charged in a two count information with breach of [the] peace in the second degree, both in violation of § 53a-181 (a) (5). The two counts are under different theories. One is that [the defendant], acting with intent to cause inconvenience, annoyance or alarm, used abusive language while in a public place. Count two charges him under the theory that the defendant recklessly created a risk of causing inconvenience, annoyance or alarm by using abusive language while in a public place in violation of § 53a-181 (a) (5) . . . . The court had an opportunity to hear the testimony of the witnesses and assess their credibility. The court credits and accepts as credible the testimony of the state's witnesses. The court was unpersuaded by the testimony of [the defendant], although, quite frankly, I don't need to make a credibility finding with respect to [the defendant] and as much as his testimony substantially corroborates the testimony of the state's witnesses. So, I've had an opportunity to apply all of the standards set forth in . . . *Liebenguth* and carefully consider them. I find that the state has proven the elements of each of these offenses beyond a reasonable doubt and viewed through the prism of *Liebenguth* and the analysis as set forth therein. The court finds [the defendant] guilty of count one as well as guilty of count two. And, inasmuch as I believe he acted intentionally . . . even if it was not intentional, it was clearly reckless."

of probation with mental health evaluation and treatment at the discretion of the Office of Adult Probation.[9] The court, however, stated that it could not "impose a sentence on two counts for what basically arises out of the same criminal conduct. [The defendant] cannot be doubly punished for offenses arising out of the same conduct. Accordingly, the court is going to vacate the sentence on count one . . . [a]nd the sentence is imposed solely with respect to count two." This appeal followed. Additional facts and procedural history will be set forth as necessary.

## I

The defendant's first claim is that the state failed to meet its burden of proof with respect to the breach of the peace charge because his speech was protected under **(1)** the first amendment to the United States constitution, and **(2)** article first, §§ 4, 5 and 14, of the Connecticut constitution. We address these claims in turn.

## A

The defendant first claims that the evidence was insufficient to support his conviction of breach of the peace in the second degree because the words he uttered to Medina were protected speech under the first amendment to the United States constitution and, thus, could not form the basis for a violation of § 53a-181 (a) (5). We disagree with the defendant.

We first set forth the legal principles that guide our resolution of this claim. "Under . . . § 53a-181 (a) (5), a person is guilty of breach of the peace in the second degree when, with the intent to cause inconvenience, annoyance or alarm, he uses abusive language in a public place. That broad statutory proscription, however, is limited by the free speech provisions of the first amendment to the United States constitution, which prohibit the government from 'restrict[ing] expression because of its message, its ideas, its subject matter, or its content' . . .

---

[9] Although the court also ordered the defendant to pay a $500 fine, it remitted the fine after finding that he was unable to pay it.

*Ashcroft* v. *American Civil Liberties Union*, 535 U.S. 564, 573, 122 S. Ct. 1700, 152 L. Ed. 2d 771 (2002); thereby protecting speech 'without regard . . . to the truth, popularity, or social utility of the ideas and beliefs [that] are offered.' *National Assn. for the Advancement of Colored People* v. *Button*, 371 U.S. 415, 445, 83 S. Ct. 328, 9 L. Ed. 2d 405 (1963). These safeguards, however, although expansive, are not absolute, and the United States Supreme Court has long recognized a few discrete categories of speech that may be prosecuted and punished, including so-called 'fighting words'—'those personally abusive epithets [that], when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction.' *Cohen* v. *California*, 403 U.S. 15, 20, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971)." (Footnotes omitted.) *State* v. *Liebenguth*, supra, 336 Conn. 687–88.

Our Supreme Court has stated that, when, as in the present case, "the defendant's conviction is predicated on his verbal statements, [a] determination of the sufficiency of the state's case necessarily depends on whether those statements deserve the protection of the first amendment, despite their patently offensive and objectionable nature. If they do, they cannot serve as the basis for his conviction, which would have to be reversed for evidentiary insufficiency. The defendant having been charged with violating § 53a-181 (a) (5) by use of allegedly 'abusive . . . language' . . . we therefore must decide whether his language, which was no doubt 'abusive' under the commonly understood meaning of that term, nonetheless is entitled to constitutional protection. To make that determination, we apply the judicial gloss necessary to limit the reach of the breach of the peace statute to ensure that it comports with constitutional requirements. See *State* v. *Baccala*, [326 Conn. 232, 234, 251, 163 A.3d 1] (placing gloss on § 53a-181 (a) (5) to avoid possibility of conviction founded on constitutionally protected speech) [cert. denied, 583 U.S. 1026, 138 S. Ct. 510, 199 L. Ed. 2d 408 (2017)]. For present purposes, 'the constitutional guarantee of freedom of speech requires that [§ 53a-181

(a) (5)] be confined to language [that], under the circumstances of its utterance, constitutes [unprotected] fighting words—those [that] by their very utterance inflict injury or tend to incite an immediate breach of the peace.' . . . *State* v. *Beckenbach*, 1 Conn. App. 669, 678, 476 A.2d 591 (1984), rev'd on other grounds, 198 Conn. 43, 501 A.2d 752 (1985). 'Accordingly, to establish the defendant's violation of § 53a-181 (a) (5) . . . in light of its constitutional gloss, the state was required to prove beyond a reasonable doubt that the defendant's words were likely to provoke an imminent violent response' under the circumstances in which they were uttered. . . . *State* v. *Baccala*, supra, 250–51." (Citations omitted.) *State* v. *Liebenguth*, supra, 336 Conn. 697–98.

Our Supreme Court applies a two part test when "considering [a] defendant's challenge to the sufficiency of the evidence to support [his] conviction of breach of the peace in the second degree in accordance with [his] first amendment rights . . . ." *State* v. *Baccala*, supra, 326 Conn. 250. As the court in *Baccala* explained: "First . . . we construe the evidence in the light most favorable to sustaining the verdict. See *State* v. *Cook*, 287 Conn. 237, 254, 947 A.2d 307, cert. denied, 555 U.S. 970, 129 S. Ct. 464, 172 L. Ed. 2d 328 (2008). Second, we determine whether the trier of fact could have concluded from those facts and reasonable inferences drawn therefrom that the cumulative force of the evidence established guilt beyond a reasonable doubt. See id. Accordingly, to establish the defendant's violation of § 53a-181 (a) (5) . . . in light of its constitutional gloss, the state was required to prove beyond a reasonable doubt that the defendant's words were likely to provoke an imminent violent response from an average [person in the addressee's] position. Cf. *State* v. *Krijger*, [313 Conn. 434, 448, 97 A.3d 946 (2014)] ('[t]o establish the defendant's violation of [General Statutes (Rev. to 2007)] §§ 53a-62 [a] [3] and 53a-181 [a] [3] on the basis of his statements to [the town attorney], the state was required to prove beyond a reasonable doubt that

those statements represented a true threat').'' **(Citation omitted.)** *State* v. *Baccala*, supra, 250–51.

Moreover, our Supreme Court has explained further that, when, as in the present case, "the state's case against the defendant implicates his free speech rights, several additional principles govern our review of the issue presented. In certain cases, such as the present one, in which '[the line between speech unconditionally guaranteed and speech that may be legitimately regulated] must be drawn, the rule is that we examine for ourselves the statements [at] issue and the circumstances under which they were made to see if they are consistent with the first amendment.'. . . Id., 251. In other words, 'the inquiry into the protected status of . . . speech is one of law, not fact.' . . . *State* v. *Parnoff*, [329 Conn. 386, 395, 186 A.3d 640 (2018)]. We therefore 'apply a de novo standard of review . . . .' Id.'' *State* v. *Liebenguth*, supra, 336 Conn. 698. "Accordingly, we have 'an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion [in] the field of free expression.' . . . [*State* v. *Parnoff*, supra] 395–96. 'This independent scrutiny, however, does not authorize us to make credibility determinations regarding disputed issues of fact. Although we review de novo the trier of fact's ultimate determination that the statements at issue constituted [fighting words], we accept all subsidiary credibility determinations and findings that are not clearly erroneous.' . . . Id., 396.'' *State* v. *Liebenguth*, supra, 698–99.

The tenets underlying the fighting words doctrine date to 1940, when the United States Supreme Court stated: "When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the state to prevent or punish is obvious. Equally obvious is it that a state may not unduly suppress free communication of views, religious or other, under the guise of conserving desirable conditions.'' *Cantwell* v. *Connecticut*, 310 U.S. 296, 308, 60

S. Ct. 900, 84 L. Ed. 1213 (1940). The test for unprotected fighting words was first set forth in *Chaplinsky* v. *New Hampshire*, 315 U.S. 568, 62 S. Ct. 766, 86 L. Ed. 1031 (1942). In *Chaplinsky*, a Jehovah's Witness was convicted after he stated to the complainant, "'You are a God damned racketeer' and 'a damned Fascist and the whole government of Rochester are Fascists or agents of Fascists' . . . ." Id., 569. The United States Supreme Court stated that "[t]here are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any [c]onstitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." (Footnote omitted.) Id., 571–72. The court explained that fighting words comprise "no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest" in maintaining order. Id., 572. The fighting words doctrine has evolved over time to better suit current social conventions, as courts have "continually resorted to analyzing provocative expression contextually . . . ." (Internal quotation marks omitted.) *State* v. *Baccala*, supra, 326 Conn. 238. "A proper contextual analysis requires consideration of the actual circumstances as perceived by a reasonable speaker and addressee to determine whether there was a likelihood of violent retaliation." Id., 240.

In explaining the contextual approach in *Liebenguth*, our Supreme Court stated: "It is by now well settled that there are no per se fighting words because words that are likely to provoke an immediate, violent response when uttered under one set of circumstances may not be likely to trigger such a response when spoken in the context of a different factual scenario. See [id., 238]. Consequently, whether words are fighting words necessarily will depend on the particular circumstances of their utterance. See id., 239; see also *State* v. *Hoskins*,

35 Conn. Supp. 587, 591, 401 A.2d 619 (App. Sess. 1978) ('The fighting words concept has two aspects. One involves the quality of the words themselves. The other concerns the circumstances under which the words are used.' . . .). This contextual approach is also 'a logical reflection of the way the meaning and impact of words change over time.' *State* v. *Baccala*, supra, **[326 Conn.]** 239; see also id. **(**'[w]hile calling someone a racketeer or a fascist might naturally have invoked a violent response in the 1940s when *Chaplinsky* was decided, those same words would be unlikely to even raise an eyebrow today'). Indeed, due to changing social norms, public discourse has become coarser in the years following *Chaplinsky*; id., 298 **(***Eveleigh*, *J.*, concurring in part and dissenting in part); such that, today, 'there are fewer combinations of words and circumstances that are likely to fit within the fighting words exception.' *State* v. *Parnoff*, supra, 329 Conn. 413 **(***Kahn*, *J.*, concurring in the judgment); see also id. **(**'[a]s certain language is acceptable in more situations, the borders of the fighting words exception contract').'' (Footnote omitted.) *State* v. *Liebenguth*, supra, 336 Conn. 700–701.

Our Supreme Court has addressed the type of speech that constitutes "fighting words" in a trio of decisions: *State* v. *Baccala*, supra, 326 Conn. 232, *State* v. *Parnoff*, supra, 329 Conn. 386, and *State* v. *Liebenguth*, supra, 336 Conn. 685. We provide a brief overview of those decisions, which inform our analysis in the present case.

In *Baccala*,[10] the defendant was convicted of breach of the peace in the second degree after engaging in a dispute

---

[10] Prior to our Supreme Court's decision in *Baccala*, its decision in *State* v. *Szymkiewicz*, 237 Conn. 613, 678 A.2d 473 (1996), set the stage for a more comprehensive totality of the circumstances analysis. See *State* v. *Baccala*, supra, 326 Conn. 237. In *Szymkiewicz*, our Supreme Court used a totality of the circumstances test to determine that insults and threats directed to a store detective constituted fighting words. See *State* v. *Szymkiewicz*, supra, 622. In *Szymkiewicz*, the defendant was accused of shoplifting at a supermarket and yelled, "fuck you," several times along with, "[y]ou fucking bitch. I hope you burn in hell for all eternity." (Internal quotation marks omitted.) Id., 615–16. The defendant in *Szymkiewicz* made those remarks while descending stairs

with the manager of a supermarket. *State* v. *Baccala*, supra, 326 Conn. 233–34. The defendant customer had called the supermarket to inquire about a money transfer but was informed by a store manager that the service desk was closed for the day and that the transfer could not be completed. Id., 235. "The defendant became belligerent, responded that she 'really didn't give a shit,' and called [the manager] '[p]retty much every swear word you can think of' before the call was terminated." Id. Shortly thereafter, the defendant arrived at the supermarket, where she loudly called the manager a "fat ugly bitch" and a "cunt," and yelled, "fuck you, you're not a manager," while gesticulating with her cane. **(**Internal quotation marks omitted.**)** Id., 236. The manager simply responded, "[h]ave a good night," after which the defendant left the supermarket. **(**Internal quotation marks omitted.**)** Id.

In its ruling, the court in *Baccala* assessed whether the defendant's language constituted fighting words under *Chaplinsky*.[11] See id., 238. In doing so, the court

in the supermarket and in the view of customers, "caus[ing] a commotion among those who were present at the bottom of the stairs." Id., 616. The court held that, "the words used by the defendant . . . and the circumstances in which they were used classify them as 'fighting words' that had the tendency to provoke imminent retaliation from the store detective or violence from the store's customers who heard them." (Footnote omitted.) Id., 620. It explained further that "[t]he combination of the heated exchange between [the store detective] and the defendant and the defendant's threatening her, all of which occurred in front of a number of store customers, provided ample impetus for a potentially explosive situation." Id., 623.

[11] The court in *Baccala* noted that, "[a]lthough certain language in *Chaplinsky* seemed to suggest that some words in and of themselves might be inherently likely to provoke the average person to violent retaliation, such as 'God damned racketeer' and 'damned Fascist' . . . *Chaplinsky* v. *New Hampshire*, supra, 315 U.S. 569, 574; subsequent case law eschewed the broad implications of such a per se approach. See *People* v. *Stephen*, 153 Misc. 2d 382, 387, 581 N.Y.S.2d 981 (1992) ('[w]hile the original *Chaplinsky* formulation of "fighting words" may have given some impression of establishing a category of words which could be proscribed regardless of the context in which they were used, developing [f]irst [a]mendment doctrine in the half century since *Chaplinsky* was decided has continually resorted to analyzing provocative expression contextually'); see also *Texas* v. *Johnson*, [491 U.S. 397, 409, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989)]; *Gooding* v. *Wilson*,

emphasized that a contextual approach is necessary to a fighting words analysis because it is a "logical reflection of the way the meaning and impact of words change over time." Id., 239. "Accordingly, a proper contextual analysis requires consideration of the actual circumstances, as perceived by both a reasonable speaker and addressee, to determine whether there was a likelihood of violent retaliation. This necessarily includes the manner in which the words were uttered, by whom and to whom the words were uttered, and any other attendant circumstances that were objectively apparent and bear on the question of whether a violent response was likely." Id., 250. Our Supreme Court noted that it is critical to consider not only the manner and circumstances in which the words were spoken, but also the personal attributes of the speaker and addressee that are reasonably apparent. See id., 241. Thus, it may be appropriate to consider "the age, gender, race, and status of the speaker. See . . . *In re Spivey*, 345 N.C. 404, 414–15, 480 S.E.2d 693 (1997) (holding that racial slur directed at African American man by white man will cause 'hurt and anger' and 'often provoke him to confront the white man and retaliate')." (Citations omitted.) *State* v. *Baccala*, supra, 326 Conn. 242.

Moreover, "because the fighting words exception is concerned with the likelihood of violent retaliation,

405 U.S. 518, 525, 92 S. Ct. 1103, 31 L. Ed. 2d 408 (1972); *Cohen* v. *California*, [supra, 403 U.S. 20, 23]; L. Tribe, American Constitutional Law (2d Ed. 1988) § 12-10, pp. 850–51. Rather, 'words may or may not be "fighting words," depending [on] the circumstances of their utterance.' *Lewis* v. *New Orleans*, 415 U.S. 130, 135, 94 S. Ct. 970, 39 L. Ed. 2d 214 (1974) (Powell, J., concurring in the result); see *R. A. V.* v. *St. Paul*, 505 U.S. 377, 432, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992) (Stevens, J., concurring in the judgment) ('[w]hether words are fighting words is determined in part by their context'); *Hammond* v. *Adkisson*, 536 F.2d 237, 239 (8th Cir. 1976) (first amendment requires 'determination that the words were used "under such circumstances" that they were likely to arouse to immediate and violent anger the person to whom the words were addressed' . . .); *State* v. *Szymkiewicz*, [237 Conn. 613, 620, 678 A.2d 473 (1996)] (considering both 'the words used by the defendant' and 'the circumstances in which they were used') . . . ." (Citation omitted.) *State* v. *Baccala*, supra, 326 Conn. 238–39.

it properly distinguishes between the average citizen and those addressees who are in a position that carries with it an expectation of exercising a greater degree of restraint." Id., 243. Although our Supreme Court previously has adopted the principle that police officers may be held to a higher standard of restraint than ordinary citizens; see id., 244; the court in *Baccala* expanded that to require that trial courts applying "the objective aspect of the fighting words standard" "take into account the circumstances of the addressee, e.g., occupation, in considering whether" the addressee "is more or less likely to respond with immediate violence." Id., 247.

In holding that the defendant's language did not constitute fighting words, the court in *Baccala* relied on several factors. See id., 252–54. First, the court determined that it was significant that the defendant had begun her verbal tirade when she first spoke to the manager on the phone because it gave the manager notice of a potential incident. See id., 252. Second, the manager's responsibilities included customer service duties, which led the court to conclude that the phone call and the manager's customer service training weighed against a finding that someone in the manager's position would react with imminent violence. See id., 252–53. Third, the court concluded that the manager would have held a high degree of control over the premises that afforded her several lawful self-help options, which, along with the expectations attendant to her position, reduced the likelihood of a violent response on her part. See id., 253. Finally, the court concluded that, although not determinative, the manager's actual response to the defendant's outburst was probative of the likelihood of a violent response. Id., 254. Specifically, the court agreed that, because the manager simply bid the defendant good night, "[t]here [was] no reason to believe that [the manager's] reaction was uncharacteristic of a reasonable professional in a like situation." Id. Therefore, the court concluded that "the defendant's speech [did] not fall within the narrow category of unprotected fighting words"; id., 256; because the defendant's "vulgar insults" were not "likely

to provoke violent retaliation"; id.; by "an average store manager" under similar circumstances. Id., 254.

Our Supreme Court again addressed the fighting words doctrine in *Parnoff*, in which the defendant was convicted of disorderly conduct after he had used threatening language toward two water company employees who had entered his property pursuant to an easement to service a fire hydrant. See *State* v. *Parnoff*, supra, 329 Conn. 388. Wearing shorts but no shirt, and carrying a can to collect worms in order to go fishing, the defendant approached the two water company employees. Id., 391. The defendant became enraged when the employees informed him that they were on his property to service the fire hydrant and had discovered that the hydrant's cap was altered. Id. The defendant said, "if you go into my shed, I'm going to go into my house, get my gun and [fucking] kill you." (Internal quotation marks omitted.) Id.

The court in *Parnoff* was not persuaded that "the defendant's threatening words, unaccompanied by any effectuating action, were likely to provoke an imminent and violent reaction from the water company employees at whom those words were directed."[12] Id., 397–98. The

---

[12] The court analyzed the defendant's words under the factors set forth in *Baccala*, including whether the reasonably apparent personal attributes of the addressees affected its analysis. See *State* v. *Parnoff*, supra, 329 Conn. 395. Specifically, the court in *Parnoff* took note of the water company employees' job performances, including the high likelihood that they might interact with confrontational property owners, which would require them to model "appropriate, de-escalating behavior." Id., 400. The court explained that, unlike in *Baccala*, the water company employees had "little control" over the defendant's property, but that difference did not "militate against any consideration of the addressees' job performance as part of the required contextual analysis." (Emphasis omitted; internal quotation marks omitted.) Id., 401. Further, the court in *Parnoff* stated that its analysis did not attempt to "equat[e]" the water company employees with the supermarket manager in *Baccala* but, rather, acknowledged that, because the water company employees were "tasked with entering strangers' properties," they would be expected to exercise some higher degree of restraint. Id.

The court in *Parnoff* distinguished *State* v. *Szymkiewicz*, 237 Conn. 613, 678 A.2d 473 (1996), stating, "[v]isible manifestations of anger, however, coupled with the defendant's threatening comments, do not,

court explained that, despite the threatening words, the context in which they were spoken did not support a finding that they were "likely to provoke an immediate and violent reaction because the objectively apparent circumstances did not indicate any immediate intent or ability on the part of the defendant to carry out that threat." Id., 399. Notably, the court cited testimony from one of the water company employees that, "not only was he not frightened by the defendant's words, but, rather, they 'bounced right off' him, stating that, 'I just stood there and was like, okay then, you know, let's see what happens.'" Id., 403. Further, when the water company employee called the police to report the incident, "he characterized the defendant as merely 'a little crabby' and made no mention at all of the defendant's gun threat." Id. Accordingly, our Supreme Court affirmed this court's judgment reversing the defendant's conviction on the ground that the defendant's speech did not constitute fighting words and, thus, was protected by the first amendment. See id., 406.

Next, we address our Supreme Court's most recent decision on this issue in *State* v. *Liebenguth*, supra, 336 Conn. 685, which involved the following relevant facts. "'Michael McCargo, a parking enforcement officer for the town of New Canaan, testified that he was patrolling the [Morse] Court parking lot on the morning of August 28, 2014, when he noticed that the defendant's vehicle was parked in a metered space for which no payment had been made. He first issued a [$15 parking] ticket for the defendant's vehicle, then walked to another vehicle to issue a ticket, while his vehicle remained idling behind the defendant's vehicle. As McCargo was returning to his vehicle, he was approached by the defendant, whom he had never before seen or interacted with. The defendant

under these particular circumstances, meet the high threshold of imminence required for the fighting words exception." *State* v. *Parnoff*, supra, 329 Conn. 404. The court in *Parnoff* also noted that, because there was no crowd present to enhance the probability of a violent reaction, the defendant's words did not rise to the same level of those in *Szymkiewicz*. See id.; see footnote 10 of this opinion.

said to McCargo, "not only did you give me a ticket, but you blocked me in." Initially believing that the defendant was calm, McCargo jokingly responded that he didn't want the defendant getting away. When the defendant then attempted to explain why he had parked in the lot, McCargo responded that his vehicle was in a metered space for which payment was required, not in one of the lot's free parking spaces. McCargo testified that the defendant's demeanor then "escalated," with the defendant [having said] that the parking authority was "[fucking] [un]believable" and [having told] McCargo that he had given him a parking ticket "because my car is white. . . . [N]o, [you gave] me a ticket because I'm white." As the defendant, who is white, spoke with McCargo, who is African-American, he "flared" his hands and added special emphasis to the profanity he uttered. Even so, according to McCargo, the defendant always remained a "respectable" distance from him. Finally, as the defendant was walking away from McCargo toward his own vehicle, he spoke the words, "remember Ferguson."' . . .

"McCargo also testified that, '[a]fter both men had returned to and reentered their vehicles, McCargo, whose window was rolled down . . . thought he heard the defendant say the words, "fucking niggers." This caused him to believe that the defendant's prior comment about Ferguson had been made in reference to the then recent [and highly publicized] shooting of an African-American man by a white police officer in Ferguson, Missouri [on August 9, 2014, approximately three weeks earlier]. [McCargo] thus believed that the [defendant's reference to Ferguson was a "threat"] meant to imply that what had happened in Ferguson "was going to happen" to him. McCargo also believed that, by uttering the racial slur and making reference to Ferguson, the defendant was trying to rile him up and [to] escalate the situation [by "taking it to a whole other level"]. That, however, did not happen, for, although McCargo found the remark offensive, and he had never before been the target of such language while performing his duties, he remained calm at all times and simply drove away to resume his

patrol.' . . . McCargo further testified, however, that, '[s]hortly thereafter . . . as [McCargo] was driving away, the defendant [cut through the parking lot in his vehicle, approached McCargo, and then] drove past him.' . . . As the defendant was driving past McCargo, 'the defendant turned toward him, looked directly at him with an angry expression on his face, and repeated the slur, "fucking niggers." McCargo [also] noted in his testimony that the defendant said the slur louder the second time than he had the first time.

"'After the defendant drove out of the parking lot, McCargo [who was shocked and personally offended by the encounter] called his supervisor, who instructed him to report the incident to the New Canaan police. In his report, McCargo noted that there might have been a witness to the interaction, whom he described as a young, white female. The defendant later was arrested in connection with the incident on the charge of breach of the peace in the second degree.'" (Citations omitted.) *State* v. *Liebenguth*, supra, 336 Conn. 689–91. Following a trial to the court, the defendant was found guilty of the charge and appealed to this court, which reversed his conviction on the ground that his speech was constitutionally protected. See id., 689.

The state, on the granting of certification, appealed to our Supreme Court, which reversed this court's judgment in part and upheld the defendant's conviction of breach of the peace in the second degree, concluding that his words constituted "unprotected fighting words," especially in light of the particular harm the word "nigger" has when directed to a Black addressee by a white person. Id., 689, 703. The court explained that, in uttering those words, the defendant, a white man, was asserting "his own perceived racial dominance and superiority over McCargo with the obvious intent of denigrating and stigmatizing him. When used in that way, '[i]t is beyond question that the use of the word "nigger" is highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination.' *McGinest* v. *GTE Service Corp.*,

360 F.3d 1103, 1116 (9th Cir. 2004). Not only is the word 'nigger' undoubtedly the most hateful and inflammatory racial slur in the contemporary American lexicon; see id.; but it is probably the single most offensive word in the English language. See, e.g., *Ayissi-Etoh* v. *Fannie Mae*, 712 F.3d 572, 580 (D.C. Cir. 2013) (Kavanaugh, J., concurring) ('[The] epithet ["nigger"] has been labeled, variously, a term that "sums up . . . all the bitter years of insult and struggle in America," [L. Hughes, The Big Sea: An Autobiography (Hill and Wang 2d Ed. 1993) p. 269], "pure anathema to African-Americans," *Spriggs* v. *Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001), and "probably the most offensive word in English." [Random House Webster's College Dictionary (2d Rev. Ed. 2000) p. 894]. See generally [A. Haley, Roots: The Saga of an American Family (Doubleday 1976)]; [H. Lee, To Kill a Mockingbird (J. B. Lippincott Co. 1960)]. . . . No other word in the English language so powerfully or instantly calls to mind our country's long and brutal struggle to overcome racism and discrimination against African-Americans.' . . . R. Kennedy, 'The David C. Baum Lecture: "Nigger!" as a Problem in the Law,' 2001 U. Ill. L. Rev. 935, 935 (although '[t]he American language is (and has long been) rife with terms of ethnic, racial, and national insult: kike, mick, wop, nip, gook, honkie, wetback, chink, [etc.] . . . "nigger is now probably the most offensive word in English"' . . .); Dictionary.com, available at https://www.dictionary.com/browse/nigger?s=t ('The term nigger is now probably the most offensive word in English. Its degree of offensiveness has increased markedly in recent years, although it has been used in a derogatory manner since at least the Revolutionary War.').

"In fact, because of the racial prejudice and oppression with which it is forever inextricably linked, the word 'nigger,' when used by a white person as an assertion of the racial inferiority of an African-American person, 'is more than [a] mere offensive utterance . . . . No word . . . is as odious or loaded with as terrible a history.' . . . *Daso* v. *Grafton School, Inc.*, 181 F. Supp. 2d 485, 493

(D. Md. 2002); see also *In re John M.*, 201 Ariz. 424, 428, 36 P.3d 772 (App. 2001) ('the term is generally regarded as virtually taboo because of the legacy of racial hatred that underlies the history of its use among whites' . . .); *In re Spivey*, [supra, 345 N.C. 414] ('[N]o fact is more generally known than that a white man who calls a black man a "nigger" within his hearing will hurt and anger the black man and often provoke him to confront the white man and retaliate. The trial court was free to judicially note this fact.'). The word being 'one of insult, abuse and belittlement harking back to slavery days' . . . *Taylor* v. *Metzger*, 152 N.J. 490, 510, 706 A.2d 685 (1998); it is uniquely 'expressive of racial hatred and bigotry' . . . . For all these reasons, the word rightly has been characterized as 'the most provocative, emotionally-charged and explosive term in the [English] language.'" (Citations omitted.) *State* v. *Liebenguth*, supra, 336 Conn. 703–705.

In *Liebenguth*, our Supreme Court found that, in addition to the use of the word "niggers," "other language and conduct by the defendant further inflamed the situation, rendering it that much more likely to provoke a violent reaction. First, the defendant used the profane adjective 'fucking'—a word of emphasis meaning wretched, rotten or accursed—to intensify the already highly offensive and demeaning character of the word 'niggers.'" (Footnote omitted.) Id., 705–706. Second, "the defendant, having directed the term 'fucking niggers' at McCargo upon entering his vehicle and learning that McCargo had ticketed him, was not content just to leave and end the confrontation. Instead, after McCargo had entered his vehicle and was starting to drive out of the parking lot, the defendant circled the lot twice, pulled up next to McCargo and, while looking angrily at him, again uttered the term 'fucking niggers,' this time more loudly than before. The fact that the defendant repeated this epithet only served to exacerbate the provocative and hostile nature of the confrontation." Id., 706. Third, "the defendant employed additional, racially offensive, crude and foreboding language during his interaction with

McCargo," including when he said " 'fucking unbeliev-able' " and " 'remember Ferguson.' " Id., 707. "Finally, in addition to his offensive and intimidating utterances, certain conduct by the defendant further manifested his extreme anger and hostility toward McCargo."[13] Id.

Acknowledging that the case presented a rare circumstance in which the demanding fighting words standard was met, the court elaborated, stating that, "[b]orn of violence, the word 'nigger,' when uttered with the intent to personally offend and demean, also engenders violence. Indeed, such use of the word 'nigger' aptly has been called 'a classic case' of speech likely to incite a violent response. *In re Spivey*, supra, 345 N.C. 415; see also *State* v. *Hoshijo ex rel. White*, 102 Haw. 307, 322, 76 P.3d 550 (2003) ('The experience of being called "nigger" . . . is like receiving a slap in the face. The injury is instantaneous.' . . .)." *State* v. *Liebenguth*, supra, 336 Conn. 708. "[Further] [t]o whatever extent public discourse in general may have coarsened over time; see, e.g., *State* v. *Baccala*, supra, 326 Conn. 239; it has not eroded to the point that the racial epithets used in the present case are any less likely to provoke a violent reaction today than they were in previous decades." *State* v. *Liebenguth*, supra, 709.

With this background in mind, we turn to the defendant's claim that his words are entitled to first amendment protection. In support thereof, the defendant makes a number of arguments, including that his language did

---

[13] Specifically, the court stated: "As the two men were speaking outside of their respective vehicles, the defendant stepped toward McCargo while moving his hands and body in an aggressive and irate manner. [A woman] witnessed the defendant's conduct and testified that, even from about seventy feet away, the hostility of the encounter made her nervous and upset. Moreover, after entering his car, the defendant drove through the parking lot twice before leaving, cutting through empty parking spaces so he could pass by McCargo and again angrily confront him. As [our Supreme Court] observed in *Baccala*, the fact that the defendant's words were accompanied by such aggressive and menacing behavior increased the likelihood of a violent response. See *State* v. *Baccala*, supra, 326 Conn. 241." *State* v. *Liebenguth*, supra, 336 Conn. 707–708.

not constitute fighting words because it was simply an expression of his opinion about his fear of an unhygienic dental office that was not likely to incite an immediate, violent reaction, and that the present case is distinguishable from *Liebenguth*.[14] We are not persuaded.

As our Supreme Court has instructed, the starting point of our analysis of whether the language used by the defendant rises to the level of "fighting words," so as not to be protected by the first amendment, begins with "an examination of the words themselves and the extent to which they are understood to be inflammatory or inciting." Id., 703. Specifically, "[a] proper contextual analysis requires consideration of the actual circumstances, as perceived by both a reasonable speaker and addressee, to determine whether there was a likelihood of violent retaliation. This necessarily includes the manner in which the words were uttered, by whom and to whom the words were uttered, and any other attendant circumstances that were objectively apparent and bear on the question of whether a violent response was likely." *State* v. *Baccala*, supra, 326 Conn. 250. We also take into consideration the "personal attributes of the speaker and the addressee that are reasonably apparent"; id., 241; which include "age, gender, [and] race . . . ." Id., 242.[15]

In the present case, it is undisputed that the defendant, a white man, uttered the words "stupid nigger" toward

[14] The defendant also contends that, if this court were to conclude that an average, multiracial dental assistant likely would react to the defendant's words with violence, we would be perpetuating the "angry Black woman" stereotype. We find no merit to this contention. As our Supreme Court has stated, "[a] proper contextual analysis requires consideration of the actual circumstances, as perceived by both a reasonable speaker and addressee, to determine whether there was a likelihood of violent retaliation"; *State* v. *Baccala*, supra, 326 Conn. 240; and, in light of *Liebenguth*, it is not improper for an appellate court to take into consideration the fact that the words uttered were directed to a Black addressee by a white person. See *State* v. *Liebenguth*, supra, 336 Conn. 703; see also *State* v. *Baccala*, supra, 242–43 (proper to consider age, gender and race of speaker and addressee).

[15] As a result of the changing landscape of the fighting words doctrine, first amendment scholars have compiled a list of five factors that lower courts consider when evaluating whether speech constitutes fighting

Medina, a multiracial woman, in a public place while Medina was performing her duties as a dental assistant. Our Supreme Court made clear in *Liebenguth* that, when the word nigger is used by a white person to assert "his own perceived racial dominance and superiority over" a Black person, which would necessarily include Medina, it not only is "beyond question . . . highly offensive and demeaning"; (internal quotation marks omitted) *State* v. *Liebenguth*, supra, 336 Conn. 703; but "is more than [a] mere offensive utterance" in that it is "uniquely expressive of racial hatred and bigotry . . . and [is] degrading and humiliating in the extreme . . . ." (Internal quotation marks omitted.) Id., 705. For that reason, the word is regarded as being "provocative, emotionally charged and explosive . . . ." (Internal quotation marks omitted.) Id. Accordingly, the language used by the defendant was undisputably offensive, degrading and inflammatory.

The primary issue in this appeal concerns the inciting nature of the defendant's language; that is, whether the defendant's words were likely to incite an imminent violent reaction in the average multiracial dental assistant in Medina's position. In this regard, we note that the defendant's words "stupid nigger" directed to Medina created a " 'classic case' " of fighting words. Id., 708; see also id. ("[i]ndeed, such use of the word 'nigger' aptly

words: "(1) [a]ggressive conduct accompanying speech; (2) the speech's volume with the guidepost being that '[t]he louder the speech, the more likely that a court may use that fact to support a disorderly conduct conviction based on the fighting words doctrine;' (3) repetition of words, with the maxim being that 'the sheer number and intensity of the profanities may cause a reviewing court to find that the intemperate speech crosses the line into unprotected fighting words;' (4) whether the target was a police officer; and (5) whether there was a racial slur and . . . whether it was the 'N' word." (Footnotes omitted.) C. Calvert, "Taking the Fight Out of Fighting Words on the Doctrine's Eightieth Anniversary: What 'N' Word Litigation Today Reveals About Assumptions, Flaws and Goals of a First Amendment Principle in Disarray," 87 Mo. L. Rev. 493, 507 (2022). Together, these factors emphasize a contextual approach to fighting words that pays special attention to racial epithets. We agree that these five factors are appropriate factors to consider in our contextual analysis, and, therefore, we take these factors into consideration in our analysis.

has been called 'a classic case' of speech likely to incite a violent response"). As our Supreme Court explained in *Liebenguth*, there is a high likelihood of immediate violence associated with a white person using the word "'nigger'" directed at a Black person. Id., 705. That was magnified by the defendant's use of the adjective "stupid" in conjunction with "nigger," suggesting that Medina lacked intelligence by reason of her ethnic background, which served only to intensify the highly offensive and demeaning nature of his use of the word "nigger." See, e.g., id., 705–706 (by using "profane adjective 'fucking,'" which court deemed an "additional measure of contempt and disgust," in conjunction with "epithet, the defendant only amplified the assaultive nature of the utterance, making it even more hateful and debasing").

We next examine the circumstances in which the inflammatory words were uttered by the defendant. First, the record demonstrates that the defendant displayed aggressive body language when he blocked Medina's only egress route from the tiny examination room while he berated her, used his height to his advantage and leaned toward her, yelling throughout the entire incident. In *Baccala*, *Parnoff* and *Liebenguth*, none of the addressees had his or her movement restricted in such a manner because all three incidents in those cases occurred in large, open spaces that allowed for retreat at any time.[16] Indeed, even in *Liebenguth*, in which our Supreme Court concluded that the defendant used fighting words, the addressee was operating his vehicle or standing in a sizeable parking lot. In the present case, we find it particularly compelling that Medina could not leave the examination room for an unknown amount of time as the defendant yelled at her, using a highly provocative and degrading racial slur.

In addition to exhibiting aggressive body language, the defendant repeated the inflammatory and denigrating racial slur multiple times and yelled it loudly, causing

---

[16] Our Supreme Court has not yet addressed the ability of an addressee to remove himself or herself from a defendant's verbal assault.

other patients to exit their examination rooms. Indeed, the defendant conceded that he yelled from the time he jumped up from the dental chair to the time he left the dental office. The fact that the defendant's loud yelling of the highly inflammatory racial slur startled other patients at the dental office and caused them to exit their examination rooms increased the likelihood of an immediate violent reaction by not only Medina, but also by the startled patients as well, especially given that one patient did confront the defendant near the examination room, asking, "[w]hat are you doing?" See *State* v. *Szymkiewicz*, 237 Conn. 613, 623, 678 A.2d 473 (1996) (defendant's language could have aroused violent reaction from store detective, to whom it was addressed, as well as customers). Moreover, as in *Liebenguth*, the defendant repeated the racial slur to Medina, aggravating the circumstances further. "The fact that the defendant repeated this epithet only served to exacerbate the provocative and hostile nature of the confrontation. See *Landrum* v. *Sarratt*, 352 S.C. 139, 145, 572 S.E.2d 476 (App. 2002) (whether epithets were uttered repeatedly is factor to be considered in fighting words determination); see also *State* v. *Szymkiewicz,* [supra, 615–16, 623] (holding that certain epithets were fighting words due, in part, to repeated nature of utterances)." *State* v. *Liebenguth*, supra, 336 Conn. 706.

Next, we examine whether Medina's position as a dental assistant required her to exercise a greater degree of restraint, which would decrease the likelihood that a person in a similar position would respond to the defendant's statements with violence. Compare *State* v. *Parnoff*, supra, 329 Conn. 399–400 (employee's job responsibilities included interactions with public that required employee to exercise greater degree of restraint), and *State* v. *Baccala*, supra, 326 Conn. 252–53 (same), with *State* v. *Liebenguth*, supra, 336 Conn. 710–11 (because employee's job responsibilities did not include interactions with public involving racial slurs, employee was not required to exercise greater degree of restraint). We do not believe that Medina was in a "position that

carries with it an expectation of exercising a greater degree of restraint"; *State* v. *Baccala*, supra, 243; when the defendant verbally accosted her with racial slurs. Moreover, there is nothing in the record indicating that Medina had received any special training concerning how to interact with patients who become irate or insulting while receiving dental care.

The defendant also argues that Medina was required to exercise a greater degree of restraint because she was employed as a dental assistant, was trained to de-escalate dental phobia, had control over the premises and had lawful self-help tools at her disposal. We do not agree. Although Medina testified that she had training about interacting with patients who show symptoms of dental phobia; see footnote 2 of this opinion; her testimony about it was brief and did not describe in any detail the type of training she received, and nothing in the record reflects that she received any training about how to interact with patients who become irate or insulting while receiving dental care. Thus, it is highly unlikely that any of Medina's training, like that of the parking enforcement officer in *Liebenguth*, would have prepared her to be verbally accosted with racial slurs while performing her duties as a dental assistant. See *State* v. *Liebenguth*, supra, 336 Conn. 710–11. We similarly reject the defendant's contention that, because Medina was "surrounded by" coworkers and patients, she had a degree of control over the premises that would warrant a higher degree of restraint on her part in the face of the defendant's language. Indeed, the record shows that, even though patients exited their examination rooms because of the defendant's loud yelling, Medina was unable to access those individuals, as the defendant was standing in the only doorway to the examination room as he berated her. Moreover, unlike the supermarket manager in *Baccala*, Medina did not have any management authority that would have required her to exercise a higher degree of restraint as a model to her subordinates. See *State* v. *Baccala*, supra, 326 Conn. 253 ("[i]ndeed, as the manager in charge of a large supermarket, [the manager] would

be expected to model appropriate, responsive behavior, aimed at de-escalating the situation, for her subordinates, at least one of whom was observing the exchange").

There is no merit to the defendant's contention that Medina was in a position that required her to exercise greater restraint because she had lawful self-help options at her disposal to rectify the situation. The record reflects that Medina asked the defendant to stop repeating the offensive racial slur but that he refused to do so. The only successful use of self-help measures occurred when another employee locked the door after the defendant left the dental office. Besides Medina requesting that the defendant cease his behavior, nothing in the record shows that Medina had access to self-help measures or to her coworkers and the patients who had exited their examination rooms, as opposed to the circumstances in *Baccala*, in which the supermarket manager had self-help options included in her job responsibilities. See id. ("[A]s a store manager, [she] would have had a degree of control over the premises where the confrontation took place. An average store manager would know as she approached the defendant that, if the defendant became abusive, the manager could demand that the defendant leave the premises, threaten to have her arrested for trespassing if she failed to comply, and make good on that threat if the defendant still refused to leave. With such lawful self-help tools at her disposal and the expectations attendant to her position, it does not appear reasonably likely that [the store manager] was at risk of losing control over the confrontation."). As addressed previously in this opinion, Medina's job responsibilities did not include managerial duties. Therefore, her job performance and training, like that of the parking enforcement officer in *Liebenguth*, as well as her level of control over the premises and the availability of self-help measures, did not support holding her to a higher degree of restraint in response to the defendant's words and actions.

Finally, the defendant attempts to distinguish the present case from *Liebenguth* because he did not augment his

language with curse words, make any racial threats, or engage in aggressive behavior, like circling a parking lot, as the defendant in *Liebenguth* did. We agree that certain circumstances in the present case differ from those in *Liebenguth*; nevertheless, we do not agree that those differences are significant enough to render *Liebenguth* inapplicable to the present case. For example, although the language in the present case differs from the language used in *Liebenguth*, we are not persuaded that the defendant's use of the word "stupid" rather than "fucking," as occurred in *Liebenguth*, is sufficiently different to distinguish the present case. Merriam-Webster's Collegiate Dictionary defines "stupid," in relevant part, as "slow of mind," "given to unintelligent decisions or acts: acting in an unintelligent or careless manner," and "lacking intelligence or reason." Merriam-Webster's Collegiate Dictionary (12th Ed. 2026) p. 1565. By using the word "stupid" in conjunction with the word "nigger," the defendant made an inflammatory statement about racial superiority. He was not simply expressing his opinion about an unhygienic dental office. See *State* v. *Liebenguth*, supra, 336 Conn. 703–704 ("With respect to the language at issue . . . the defendant, who is white, uttered the words 'fucking niggers' to McCargo, an African-American person, thereby asserting his own perceived racial dominance and superiority over McCargo with the obvious intent of denigrating and stigmatizing him. When used in that way, '[i]t is beyond question that the use of the word "nigger" is highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination.'"). Furthermore, we find it persuasive that at least one other state court has concluded that the phrase "stupid nigger," when combined with certain conduct, can constitute fighting words. See *In re A.R.*, 781 N.W.2d 644, 649–50 (N.D. 2010) (juvenile's speech constituted fighting words when juvenile repeatedly yelled " 'stupid nigger' " at victim while involved as member of group that encircled victim).

Additionally, even though the defendant in the present case did not make a reference to the killing of an

unarmed Black man, as was done by the defendant in *Liebenguth*, that was but one factor considered by our Supreme Court in *Liebenguth*. See *State* v. *Liebenguth*, supra, 336 Conn. 705–708. Indeed, our Supreme Court in *Liebenguth* emphasized the harm that the word "nigger" carries, especially when directed by a white person to a Black person. Id., 703–704. Further, like the defendant's menacing conduct in *Liebenguth* in circling the parking lot in his vehicle, pulling up next to McCargo's vehicle and again directing the words "fucking niggers" to McCargo, the defendant in the present case blocked the only exit to the small examination room in which Medina was confined, while, in a loud and intimidating way, yelling that she was a "stupid nigger." He engaged in aggressive conduct by yelling at Medina, using words that were intended to demean and intimidate her, causing a commotion that disrupted the entire dental office and prompted one patient to confront the defendant, and stood in the only doorway to a small examination room as he repeatedly used demeaning racial epithets.[17] Despite the few differences between the present case and *Liebenguth*, we conclude that the circumstances of the present case similarly warrant a finding that the defendant's words constituted fighting words.

On the basis of the foregoing, we conclude that the defendant's words were likely to provoke an immediate violent reaction from a reasonable person under the

---

[17] We note that the defendant contends that the current state of the fighting words doctrine requires courts to make unlawful assumptions about addressees. As the defendant aptly notes, members of our Supreme Court have expressed doubts about the continuing vitality of the fighting words doctrine. See *State* v. *Liebenguth*, supra, 336 Conn. 736–37 (*Ecker*, *J.*, concurring) (expressing concerns that "[t]he doctrine . . . confers or withdraws constitutional protection depending on the demographic characteristics of the relevant individuals" and that "part of the constitutional analysis is an assessment of the *addressee's* physical abilities and aggressive tendencies" (emphasis in original)); *State* v. *Parnoff*, supra, 329 Conn. 411 (*Kahn*, *J.*, concurring) ("[t]he continuing vitality of the fighting words exception is dubious and the successful invocation of that exception is so rare that it is practically extinct"). Nevertheless, unless and until the doctrine is abandoned, we must follow the test set forth by our Supreme Court.

circumstances in which the words were uttered.[18] See *State* v. *Liebenguth*, supra, 336 Conn. 718. As a result, they constituted fighting words that are not protected by the first amendment and, thus, provided a sufficient basis for his conviction of breach of the peace in the second degree in violation of § 53a-181 (a) (5).

B

The defendant also claims that his speech was protected under article first, §§ 4, 5 and 14, of the Connecticut constitution. Specifically, the defendant argues that the Connecticut constitution provides broader protection for offensive speech and "should be read to protect such 'offensive language' and only criminalize true threats and imminent lawless action, not fighting words." We disagree.

We first set forth the legal principles that guide our resolution of this claim. To reiterate our standard of review, "the inquiry into the protected status of . . . speech is one of law, not fact. . . . We therefore apply a de novo standard of review . . . . Accordingly, we have an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion [in] the field of free expression. . . . This independent scrutiny, however, does not authorize us to make credibility determinations regarding disputed issues of fact. Although we review

---

[18] Our conclusion is not undermined by the fact that Medina, despite being shocked by the defendant's outburst and use of demeaning and inflammatory language and having been brought to tears, did not react violently in the face of the defendant's tirade. See *State* v. *Liebenguth*, supra, 336 Conn. 711 ("[even] [t]hough the fighting words standard is an objective inquiry . . . examining the subjective reaction of an addressee, although not dispositive, may be probative of the likelihood of a violent reaction" (internal quotation marks omitted)). Our Supreme Court reached a similar conclusion in *Liebenguth* and cited *State* v. *Hoshijo ex rel. White*, supra, 102 Haw. 322, for the following proposition: " '[It] is of no consequence . . . [that violence was not precipitated], as the proper standard is whether the words were *likely to provoke a violent response*, not whether violence occurred. Plainly, there is no requirement that violence must occur, merely that there be a likelihood of violence.'" (Emphasis in original.) *State* v. *Liebenguth*, supra, 711–12.

de novo the trier of fact's ultimate determination that the statements at issue constituted [fighting words], we accept all subsidiary credibility determinations and findings that are not clearly erroneous." (Citations omitted; internal quotation marks omitted.) *State* v. *Liebenguth*, supra, 336 Conn. 698–99.

The defendant seeks review of this unpreserved state constitutional claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). "Under *Golding*, a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: **(1)** the record is adequate to review the alleged claim of error; **(2)** the claim is of constitutional magnitude alleging the violation of a fundamental right; **(3)** the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and **(4)** if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; internal quotation marks omitted.) *State* v. *Benson*, 235 Conn. App. 594, 603, 346 A.3d 55, cert. denied, 353 Conn. 928, 346 A.3d 511 (2025).

We conclude that the record is adequate for review of the defendant's claim that the Connecticut constitution protects " 'offensive language' " and that the defendant has presented a claim of constitutional magnitude. See *State* v. *Billings*, 217 Conn. App. 1, 24 n.15, 287 A.3d 146 (2022) ("[t]he record is adequate for review, and the claim, asserting a violation of the defendant's right to freedom of speech, is of constitutional magnitude" (internal quotation marks omitted)), cert. denied, 346 Conn. 907, 288 A.3d 217 (2023). We thus proceed to the third prong of *Golding*—whether the defendant has demonstrated the existence of a constitutional violation.

"It is [well established] that federal constitutional and statutory law establishes a minimum national standard for the exercise of individual rights and does not inhibit

state governments from affording higher level[s] of protection for such rights. . . . In determining the contours of the protections provided by our state constitution, [appellate courts] employ a multifactor approach that [our Supreme Court] first adopted in [*State* v. *Geisler*, 222 Conn. 672, 684, 610 A.2d 1225 (1992)]. The factors that we consider are: (1) the text of the relevant constitutional provisions; (2) related Connecticut precedents; (3) persuasive federal precedents; (4) persuasive precedents of other state courts; (5) historical insights into the intent of [the] constitutional [framers]; and (6) contemporary understandings of applicable economic and sociological norms." (Citation omitted; internal quotation marks omitted.) *Trusz* v. *UBS Realty Investors, LLC*, 319 Conn. 175, 191–92, 123 A.3d 1212 (2015). "These factors, [commonly referred to as the *Geisler* factors and] which we consider in turn, inform our application of the established state constitutional standards . . . to the defendant's [claim] in the present case." (Internal quotation marks omitted.) *State* v. *McCleese*, 333 Conn. 378, 387–88, 215 A.3d 1154 (2019).[19]

### 1

We begin our analysis by reviewing the text of the relevant constitutional provisions. The defendant contends that, because our Supreme Court in *Trusz* v. *UBS Realty Investors, LLC*, supra, 319 Conn. 193, found that the Connecticut constitution provides "more expressive and forceful speech protection" than its federal counterpart, we should construe article first, §§ 4, 5 and 14, of

___

[19] We addressed the issue of whether § 53a-181 (a) (5) is unconstitutional under the state constitution in *State* v. *Caracoglia*, 78 Conn. App. 98, 826 A.2d 192, cert. denied, 266 Conn. 903, 832 A.2d 65 (2003), in which this court concluded that, "[a]lthough . . . an even greater degree of scrutiny may be applied under our state constitution . . . § 53a-181 (a) (5) is not vague or overbroad under the Connecticut constitution for the same reasons that it is not vague or overbroad under the federal constitution. . . . '[A]busive language' may be interpreted as 'fighting words,' which are not protected by our state constitution." Id., 110–11. Although the issue in *Caracoglia* is different from the issue in this appeal, our reasoning in *Caracoglia* informs our resolution of the defendant's claim.

the Connecticut constitution to protect fighting words. The state, on the other hand, argues that, despite our Supreme Court's prior findings that the Connecticut constitution affords more protection for certain speech, the qualifying language in article first, §4, permits the state to punish fighting words in the interest of preserving public peace and safety. We agree with the state.

Article first, §4, of the Connecticut constitution provides that "[e]very citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty." Article first, §5, of the Connecticut constitution provides that "[n]o law shall ever be passed to curtail or restrain the liberty of speech or of the press." Finally, article first, §14, of the Connecticut constitution provides that "[t]he citizens have a right, in a peaceable manner, to assemble for their common good, and to apply to those invested with the powers of government, for redress of grievances, or other proper purposes, by petition, address or remonstrance."

"[Our Supreme Court] previously has held that . . . unlike the first amendment to the federal constitution: **(1)** article first, §4, of the Connecticut constitution includes language protecting free speech 'on all subjects'; **(2)** article first, §5, of the Connecticut constitution uses the word 'ever,' thereby providing 'additional emphasis to the force of the provision' . . . and **(3)** article first, §14, of the Connecticut constitution provides a right to seek redress for grievances by way of 'remonstrance,' and therefore 'sets forth free speech rights more emphatically than its federal counterpart' . . . ." (Citations omitted.) *Trusz* v. *UBS Realty Investors, LLC*, supra, 319 Conn. 192–93. The court further explained that "these textual differences warrant an interpretation separate and distinct from that of the first amendment." (Internal quotation marks omitted.) Id., 193.

In the present case, the defendant argues that, because the court in *Trusz* found that the Connecticut constitution protects "'the widest possible range of topics'" and "'sets forth free speech rights more emphatically than its

federal counterpart'"; id., 192–93; we should conclude that the state constitution protects fighting words. We agree that the Connecticut constitution provides broader protection for free speech rights than its federal counterpart, but we do not construe the holding in *Trusz* to protect fighting words under our state constitution. The court in *Trusz* stated that the "language protecting free speech on all subjects . . . support[ed] the conclusion that the state constitution protects employee speech in the public workplace on the widest possible range of topics, *as long as the speech does not undermine the employer's legitimate interest in maintaining discipline, harmony and efficiency in the workplace*." (Citations omitted; emphasis added.) Id. Notably, the court in *Trusz* acknowledged the qualifying language in article first, § 4, of the Connecticut constitution[20] to preserve an employer's interest in maintaining a peaceful and collaborative workplace. Id., 193. Thus, we do not construe *Trusz* as extending protection to speech, such as fighting words, that disrupts the public peace and safety.

We find guidance on this issue from the concurring opinion in *Baccala* authored by Justice Eveleigh.[21] In *Baccala*, our Supreme Court was asked, but declined, to examine whether the language of article first, §§ 4, 5 and 14, of the Connecticut constitution protects fighting words. See *State* v. *Baccala*, supra, 326 Conn. 237. Justice Eveleigh, nonetheless, analyzed that issue under the *Geisler* factors in his concurring opinion. See id.,

[20] The liberty to speak freely on all subjects pursuant to article first, § 4, of the Connecticut constitution is qualified by the plain terms of that section, namely, by holding each citizen "responsible for the abuse of that liberty." In other words, this qualifying language operates as a limitation on the broad protections afforded to expressive liberties by holding a person responsible for abusing the liberty of free speech.

[21] Justice Eveleigh authored a concurring and dissenting opinion in *Baccala*. His *Geisler* analysis of this issue, in which he concludes that the fighting words doctrine is not afforded greater protection under our state constitution than under the federal constitution; see *State* v. *Baccala*, supra, 326 Conn. 270 (*Eveleigh, J.*, concurring); is part of his concurrence with that portion of the majority's opinion upholding the trial court's judgment of conviction. For convenience, we refer to Justice Eveleigh's opinion as a concurring opinion.

269–300 (*Eveleigh, J.*, concurring). As Justice Eveleigh noted, our Supreme Court "has observed that [article first, §4, of the Connecticut constitution] operates as a limitation on the broad protections otherwise afforded by permitting the enforcement of laws regulating speech that tended to cause a breach of the peace such as defamation or sedition. . . . Therefore, [our Supreme Court] has interpreted the text of §4 to permit punishment, within certain bounds, of abuse of the freedom of speech. Additionally, the text of §§4 and 5 in no way suggests that the legislature's authority to punish abuses of expressive liberties was limited to then prevailing statutory criminal law. Thus, while the language of §§4 and 5 provides for broader protection than afforded under the federal constitution, the language of §4 more directly pertains to the state's authority to punish the abuse of expressive liberties." (Citation omitted; footnote omitted.) Id., 274; see also *Cologne* v. *Westfarms Associates*, 192 Conn. 48, 64 n.9, 469 A.2d 1201 (1984); *State* v. *McKee*, 73 Conn. 18, 29, 46 A. 409 (1900). Justice Eveleigh concluded that "the text of §§4 and 5 does not support [a] . . . position that our state constitution defines the concept fighting words more narrowly." *State* v. *Baccala*, supra, 274–75 (*Eveleigh, J.*, concurring). We agree that the Connecticut constitution limits free speech when there has been an "abuse of that liberty." Conn. Const., art. I, §4. We, thus, conclude that the language of the relevant state constitutional provisions supports the state's argument that fighting words are not protected under the Connecticut constitution.

2

We next address the second *Geisler* factor—related Connecticut precedents. In the present case, the defendant argues that the Connecticut constitution protects fighting words because Connecticut courts "have consistently held that the Connecticut constitution bestows greater expressive rights on the public than the federal

constitution.”[22] Although this has been true for certain speech, the state points to both preconstitutional and postconstitutional jurisprudence to support its position that fighting words are not protected under our state constitution. We disagree with the defendant.[23]

We begin with a review of Connecticut's earliest related precedents. As a colony, Connecticut adopted parts of

[22] We reject the defendant's argument that the Connecticut constitution protects fighting words, given that at least two Connecticut Supreme Court justices have expressed concerns about the vitality of the fighting words doctrine. We acknowledge Justice Kahn's and Justice Ecker's sentiments concerning the fighting words doctrine, but we cannot conclude that Connecticut precedent supports the defendant's position. We address this argument further in our discussion of *Geisler*'s public policy factor in part I B 6 of this opinion. See also *State* v. *Liebenguth*, supra, 336 Conn. 725 (*Ecker*, *J.*, concurring); id., 719 (*Kahn*, *J.*, concurring); *State* v. *Parnoff*, supra, 329 Conn. 407 (*Kahn*, *J.*, concurring in the judgment).

[23] In his principal appellate brief, the defendant contends that, because our Supreme Court has yet to address the applicability and scope of the fighting words doctrine under our state constitution, this court will be writing "on a blank slate . . . ." We disagree with this contention for reasons similar to those set forth by Justice Eveleigh in *Baccala*, in which the defendant in that case made a similar argument.

First, Justice Eveleigh stated: "The defendant is incorrect that, because of the absence of appellate case law discussing the scope of the fighting words doctrine under the Connecticut constitution, this court simply writes on a blank slate, unguided by state appellate precedents. First, the absence of case law on the matter strongly suggests that this factor does not support the defendant's position. See *State* v. *Skok*, 318 Conn. 699, 709, 122 A.3d 608 (2015) ('because Connecticut courts have not yet considered whether article first, § 7, [of the Connecticut constitution] provides greater protection than the federal constitution with respect to recording telephone conversations with only one party's consent, the second *Geisler* factor also does not support the defendant's claim').

"Second, in *Trusz* v. *UBS Realty Investors, LLC*, supra, 319 Conn. 195–97, this court looked to appellate precedents not for controlling authority on the precise legal issue at hand; rather, it looked to appellate authority for broader principles that underpin this state's expressive rights jurisprudence to inform the analysis. In *Trusz*, this court looked to *State* v. *Linares*, [232 Conn. 345, 386, 655 A.2d 737 (1995)], for the state constitutional expressive rights principle of favoring flexible, case-by-case analytic frameworks over rigid, categorical tests. See *Trusz* v. *UBS Realty Investors, LLC*, supra, 195. Additionally, [our Supreme Court] looked to the Appellate Court's decision in *State* v. *DeFusco*, 27

English common law to serve as a basis for its own law.[24] See 1 Z. Swift, A System of the Laws of the State of Connecticut (1795) p. 1 ("[t]he common law of England is obligatory in this state by immemorial usage, and consent, so far as it corresponds with our circumstances and situation"); see also L. Meyer, "Connecticut's Anti-Originalist Constitutions and Its Independent Courts," 40 Quinnipiac L. Rev. 501, 619 (2022) ("the early Connecticut jurists did not simply adopt or defer to English common law, but carefully weighed its principles in light of local applications and practices"). As a result, early Connecticut jurisprudence consistently referenced English common law. See *State* v. *Avery*, 7 Conn. 266, 269 (1828) (adopting English common-law offense of libel because no similar prosecutions had yet occurred in Connecticut); see also *State* v. *Warner*, 34 Conn. 276, 279 (1867) (affirming adoption of English common-law offense of libel because speech "was sufficiently scurrilous, abusive and indecent, and calculated to stir up and provoke contention and strife, and so far to disturb the peace"). "Indeed, the common law provides valuable insight to inform our understanding of constitutional principles. See E. Peters, 'Common Law Antecedents of Constitutional Law in Connecticut,' 53 Alb. L. Rev. 259, 264 (1989) ('In defining and enacting constitutional bills of rights, state and national constituencies would, of course, have drawn [on] the experience of the

Conn. App. 248, 256, 606 A.2d 1 (1992), aff'd, 224 Conn. 627, 620 A.2d 746 (1993), for the broad proposition that the Connecticut constitution has tended to preserve civil liberty protections previously afforded by the federal constitution but from which the United States Supreme Court has retreated. See *Trusz* v. *UBS Realty Investors, LLC*, supra, 196–97." *State* v. *Baccala*, supra, 326 Conn. 278–79 n.19 (*Eveleigh, J.*, concurring).

[24] The defendant, citing L. Meyer, "Connecticut's Anti-Originalist Constitutions and Its Independent Courts," 40 Quinnipiac L. Rev. 501, 619 (2022), argues that English common law is "not persuasive or even relevant, as early Connecticut jurists did not adopt or defer to English common law." For the reasons set forth in this opinion, we do not agree with the defendant's characterization of either early Connecticut precedent or the argument set forth by Professor Linda Ross Meyer in her law review article.

common law. . . . Just as the precepts of the common law influence the style of constitutional adjudication in [common-law] courts, so common law case law itself is part of our "usable past." ')." *State* v. *Baccala*, supra, 326 Conn. 276 (*Eveleigh*, *J.*, concurring).

In 1828, our Supreme Court in *Avery* concluded that "the sending of a letter to [another] party, filled with abusive language, is an indictable offence, because it tends to a breach of the peace." *State* v. *Avery*, supra, 7 Conn. 269. As the court explained, although the sending of such a letter to another might not support an action for libel given that there is no publication, "the sending of such a letter, without other publication, is clearly an offence of a public nature, and punishable as such, as it tends to create ill-blood, and cause a disturbance of the public peace." Id. "This common-law offense originated in England, where it was observed that sending an 'infamous' letter to another person constituted an 'offense to the King, and is a great motive to revenge, and tends to the breaking of the peace . . . .' *Edwards* v. *Wooton*, 77 Eng. Rep. 1316, 1316–17 (K.B. 1655); see also *Hickes's Case*, 79 Eng. Rep. 1240, 1240–41 (K.B. 1682). Chief Justice Zephaniah Swift included the common-law offense of provocation to breach of the peace in the second volume of his digest of the state's laws published in 1823. See 2 Z. Swift, A Digest of the Laws of the State of Connecticut (1823) pp. 340–41. At the very least, Connecticut common law embraced the principle that speech that tended to cause a breach of the peace was illegitimate . . . ." (Footnote omitted.) *State* v. *Baccala*, supra, 326 Conn. 276–77 (*Eveleigh*, *J.*, concurring). This was further demonstrated in 1867, when our Supreme Court upheld a conviction of breach of the peace under a state statute that made "it a crime 'to disturb or break the peace, or stir up and provoke contention and strife, by following or mocking any person with scurrilous or abusive or indecent language or gestures or noise.' " *State* v. *Warner*, supra, 34 Conn. 276 (preliminary statement of facts and procedural history). In *Warner*, the defendant directed a number of insults

and abusive language toward a contractor for repairing highways, calling the contractor "'a damned old sheep thief,' 'a damned knave,' 'a Goddamned old scoundrel,' 'a damned old rascal,' and 'an old gray-headed curse,' and charged him with having sold a broken-backed steer for a sound one, and a sick hog that died, to a poor laboring man, and asking him if it was not true that he stole a ram, saying that folks said he did, and that he would rise right up if he was bleated at." Id., 276–77 (preliminary statement of facts and procedural history). Our Supreme Court observed that the defendant's "language was sufficiently scurrilous, abusive and indecent, and calculated to stir up and provoke contention and strife, and so far to disturb the peace," and rejected the defendant's claim that there was no evidence of "following up or mocking as the statute contemplates, or that contention and strife were in fact stirred up by his conduct." Id., 279. These decisions demonstrate that early Connecticut law sought to deter speech that disrupted the public peace.

In *McKee*, our Supreme Court addressed the state constitution's guarantee of free speech, holding that, "[t]he liberty protected is not the right to perpetrate acts of licentiousness, or any act inconsistent with the peace or safety of the [s]tate. Freedom of speech and press does not include the abuse of the power of tongue or pen, any more than freedom of other action includes an injurious use of one's occupation, business, or property." *State* v. *McKee*, supra, 73 Conn. 29. Notably, the court in *McKee* found that the state's power to "punish acts as injurious to the public health, safety or morals" is not "limited to acts within the adjudicated scope of the common-law offenses of nuisance and libel . . . ." Id., 23. The court, after analyzing the provisions of our state constitution, concluded that "[e]very citizen has an equal right to use his mental endowments, as well as his property, in any harmless occupation or manner; but he has no right to use them so as to injure his fellow-citizens, or to endanger the vital interests of society. Immunity in the mischievous

use is as inconsistent with civil liberty as prohibition of the harmless use." Id., 28.

Even though Connecticut courts have left the bounds of free speech largely undefined, our courts consistently have held that speech that tends to disturb the peace and jeopardize public safety may be regulated. See, e.*g.*, *State* v. *Pape*, 90 Conn. 98, 105, 96 A. 313 (1916) ("[l]iberty of speech and of the press is not license, not lawlessness, but the right to fairly criticise and comment"); see also *Trusz* v. *UBS Realty Investors, LLC*, supra, 319 Conn. 193 (employee speech is protected so long as it does not undermine employer's legitimate interest in maintaining discipline, harmony and efficiency in workplace). Indeed, in *State* v. *Sinchuk*, 96 Conn. 605, 115 A. 33 (1921), our Supreme Court acknowledged the breadth of legislative authority to regulate speech that may be harmful to public peace, stating: "It may be admitted that the publication of matter concerning the form of the [f]ederal [g]overnment, which is merely scurrilous or abusive, is not necessarily a direct incitement of disobedience to any other law, but it is not necessary to look outside of the statute itself to find a legal basis for criminality, because the [public] [a]ct itself is the declaration of the General Assembly that the publication of the prohibited forms of expression does endanger the public peace and safety. This declaration it has power to make unless the court can see that it is plainly unfounded." Id., 609–10.

Our Supreme Court most recently addressed article first, §§4, 5 and 14, of the Connecticut constitution in the context of restrictions on speech that take place on public property in *State* v. *Linares*, 232 Conn. 345, 655 A.2d 737 (1995), and employee speech in *Trusz* v. *UBS Realty Investors, LLC*, supra, 319 Conn. 175. Notably, in conducting a state constitutional analysis of General Statutes §2-1d (a) (2) (C) and (E), which prohibits interfering with the legislative process, pursuant to the *Geisler* factors, our Supreme Court in *Linares* "decline[d] to follow the modern, forum based approach currently employed to resolve claims under the first amendment to

the United States constitution that concern abridgement of speech on public property" and, instead, "adopt[ed] the 'compatibility' test, as expressed in *Grayned* v. *Rockford*, [408 U.S. 104, 116–17, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972)],[25] for claims brought under the Connecticut constitution that involve restrictions on speech on public property." (Footnote added.) *State* v. *Linares*, supra, 379. In doing so, the court in *Linares* noted that "our state constitution is an instrument of progress, it is intended to stand for a great length of time and should not be interpreted too narrowly or too literally so that it fails to have contemporary effectiveness for all of our citizens." (Internal quotation marks omitted.) Id., 382. The court further stated that "our constitution's speech provisions reflect a unique historical experience and a move toward enhanced civil liberties, particularly those liberties designed to foster individuality. . . . This historical background indicates that the framers of our constitution contemplated vibrant public speech, and a minimum of governmental interference, which would be best fulfilled by the less intrusive *Grayned* model," as it "will best enable our courts to adapt the central tenets of free speech jurisprudence to the ever changing nature of public expression and communication in modern society. . . . [T]his flexible approach prohibits the government from unilaterally and unnecessarily limiting speech at public locations; it avoids the grant of plenary power [that] allows the government to tilt the dialogue heard by the public, to exclude many, more marginal, voices." (Citations omitted; internal quotation marks omitted.) Id., 385–86.

Despite its adoption of the flexible framework for analyzing claims concerning the abridgement of speech on

---

[25] The *Grayned* approach assesses "whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." *Grayned* v. *Rockford*, supra, 408 U.S. 116. By contrast, the more rigid federal forum analysis "affords the most rigorous protection of speech only at 'traditional' forums and narrowly defines 'traditional' to exclude modern public gathering places often otherwise compatible with public expression." *State* v. *Linares*, supra, 232 Conn. 382.

public property, the court, nonetheless, rejected the defendant's overbreadth claim under the Connecticut constitution, concluding that "the *Grayned* test requires the government, under the Connecticut constitution, to permit free speech and public expression on government property up to the point when such free expression becomes 'basically incompatible with the normal activity of a particular place at a particular time. . . . [I]n assessing the reasonableness of a regulation, we must weigh heavily the fact that communication is involved; the regulation must be narrowly tailored to further the [s]tate's legitimate interest.' . . . This standard balances the vital role of free expression in a democratic society with the need for reasonably functional governmental institutions and mechanisms. 'The nature of a place, the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable.' " (Citation omitted.) Id., 386–87. Therefore, although, as the defendant contends, the court in *Linares* recognized broader free speech rights in the public forum context, those free speech rights are limited to speech that is compatible with the activity of the forum.

Subsequently, in *Trusz* v. *UBS Realty Investors, LLC*, supra, 319 Conn. 175, our Supreme Court addressed whether the Connecticut constitution affords employees broader free speech protections than does the first amendment. In *Trusz*, the plaintiff was terminated from his position as a managing director of a real estate investment management services company after he raised concerns about violations of securities laws. Id., 179, 181. Thereafter, the plaintiff commenced an action against the company, alleging a violation of General Statutes § 31-51q because he had been subjected to discipline " 'on account of the exercise . . . of rights guaranteed by . . . [§§] 3, 4 or 14 of article first of the [c]onstitution of Connecticut.' " Id., 181. The court in *Trusz* rejected the more recent and restrictive federal standard for analyzing claims concerning expressive rights of employees set forth in *Garcetti* v. *Ceballos*, 547 U.S. 410, 418–20, 126

S. Ct. 1951, 164 L. Ed. 2d 689 (2006),[26] in favor of the older, more flexible *Connick/Pickering*[27] standard, which balances the state constitutional right to speak freely on all subjects with an employer's interest in efficient operations. See *Trusz* v. *UBS Realty Investors, LLC*, supra, 210. Accordingly, the court in *Trusz* concluded "that the weight of *persuasive* federal precedent favors a broader reading of the free speech provisions of the state constitution than of the first amendment." (Emphasis in original.) Id., 205.

The court in *Trusz* made clear, however, that an employer does not infringe on an employee's

[26] Under the *Garcetti* test, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for [f]irst [a]mendment purposes, and the [c]onstitution does not insulate their communications from employer discipline. *Garcetti* v. *Ceballos*, supra, [547 U.S. 421] . . . ." (Internal quotation marks omitted.) *Trusz* v. *UBS Realty Investors, LLC*, supra, 319 Conn. 185. "The court in *Garcetti* reasoned that '[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created.' *Garcetti v. Ceballos,* supra, 421–22. Accordingly, under *Garcetti,* a court will subject the employee's speech to the balancing test [set forth in *Connick* v. *Myers*, 461 U.S. 138, 142, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983), and *Pickering* v. *Board of Education*, 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)] only if it first determines that the employee was not speaking pursuant to his or her official duties; if the employee was speaking as an employee rather than as a citizen, the speech is not protected by the first amendment." *Trusz* v. *UBS Realty Investors, LLC*, supra, 185; see also footnote 27 of this opinion.

[27] See *Connick* v. *Myers*, 461 U.S. 138, 142, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983); *Pickering* v. *Board of Education*, 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968). The *Connick/Pickering* standard involves a balancing of interests and "weighs an employee's [f]irst [a]mendment rights against the interests of the [s]tate as an employer in promoting the efficiency of the public services it performs through its employees." *Crandon* v. *State*, 257 Kan. 727, 740, 897 P.2d 92 (1995), cert. denied sub nom. *Crandon* v. *Dunnick*, 516 U.S. 1113, 116 S. Ct. 913, 133 L. Ed. 2d 844 (1996). The *Connick/Pickering* standard protects employee speech that involves a matter of public concern, whereas, under *Garcetti*, speech made pursuant to an employee's official duties is not protected by the first amendment. See *Trusz* v. *UBS Realty Investors, LLC*, supra, 319 Conn. 184–85.

constitutional rights when an employee is disciplined for issues that are not a matter of public concern. See id., 211. Therefore, while *Trusz* expanded speech rights for employees under the state constitution, it reaffirmed the concept that disruptive speech not regarding a matter of public concern is not protected by the Connecticut constitution. See id. ("[i]n our view, Justice Souter's test [set forth in his dissenting opinion in *Garcetti* v. *Ceballos*, supra, 547 U.S. 427] properly balances the employer's heightened interest in controlling employee speech pursuant to official job duties—an interest that [*Pickering* v. *Board of Education*, 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)] did not specifically address—and the important interests of the employee and of the public in allowing employees to speak without fear of retaliation about matters of particularly acute public concern—interests that the *Garcetti* standard fails to protect").

In summary, as noted by Justice Eveleigh in *Baccala*, both *Linares* and *Trusz* "show that Connecticut's constitution provides broader freedom of expression protections than the federal counterpart." *State* v. *Baccala*, supra, 326 Conn. 279 (*Eveleigh, J.*, concurring). They also demonstrate, however, that those broader freedoms are not without limitation.

The most recent Connecticut jurisprudence to address free speech under the state constitution is Justice Eveleigh's concurrence in *State* v. *Baccala*, supra, 326 Conn. 269.[28] In his *Geisler* analysis of this factor, Justice Eveleigh also examined "appellate case law analyzing state constitutional principles with respect to content based regulation of speech" and determined that it "embraces a philosophy that balances the expressive liberties with the responsibility not to abuse such liberties." Id., 280. First, Justice Eveleigh noted that, in *State* v. *McKee*, supra, 73 Conn. 18, in connection with

[28] Justice Eveleigh was joined by then Chief Justice Rogers and then Justice Espinosa in concurring in part and dissenting in part as to the majority's reversal of the trial court's judgment. See *State* v. *Baccala*, supra, 326 Conn. 257, 309 (*Eveleigh, J.*, concurring).

a challenge to a statute punishing the publication of "'criminal news, police reports, or pictures and stories of deeds of bloodshed, lust, or crime'"; *State* v. *Baccala*, supra, 280–81 (*Eveleigh, J.*, concurring); our Supreme Court concluded that "[f]reedom of speech and press does not include the abuse of the power of tongue or pen, any more than freedom of other action includes an injurious use of one's occupation, business, or property," and that "the notion that the state constitution created a refuge for those who sought to abuse expressive liberties to the detriment of society belittle[d] the conception of constitutional safeguards and implie[d] ignorance of the essentials of civil liberty." (Internal quotation marks omitted.) Id., 281 (*Eveleigh, J.*, concurring). Justice Eveleigh concluded that "[t]hese principles of civil liberty are interwoven into [our Supreme Court's] reasoning in subsequent cases rejecting state constitutional free speech challenges to statutes proscribing abuse of expressive liberties." Id., citing *State* v. *Sinchuk*, supra, 96 Conn. 616, and *State* v. *Pape*, supra, 90 Conn. 103.

Recognizing that "the narrow holdings of these early twentieth century expressive rights cases would not likely withstand modern constitutional scrutiny," Justice Eveleigh noted that the defendant in *Baccala*, nonetheless, was incorrect in his assertion that, "because the cases provide no evidence of the scope of expressive rights protection in 1818 [when the state constitution was ratified] . . . they provide no meaningful insight to [our Supreme Court's] analysis." *State* v. *Baccala*, supra, 326 Conn. 283. Rather, as Justice Eveleigh explained, "these cases evince a philosophy not dissimilar from that prevailing in 1818—namely, the belief that citizens should be free to express themselves but that they bear responsibility for the abuse of that right." Id.

Because Connecticut precedent has consistently favored restrictions on speech that harms others or disrupts business or the public peace, we conclude that this

factor weighs in favor of finding that the state constitution does not protect fighting words.

3

We next turn to the third *Geisler* factor, persuasive federal precedents. As discussed in part I A of this opinion, the federal constitution does not protect speech that provokes an ordinary person to respond with immediate violence. See, e.g., *Snyder* v. *Phelps*, 562 U.S. 443, 458, 131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011); *R. A. V.* v. *St. Paul*, 505 U.S. 377, 388, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992); *Texas* v. *Johnson*, 491 U.S. 397, 409, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989); *Gooding* v. *Wilson*, 405 U.S. 518, 522–23, 92 S. Ct. 1103, 31 L. Ed. 2d 408 (1972); *Cohen* v. *California*, supra, 403 U.S. 20; *Chaplinsky* v. *New Hampshire*, supra, 315 U.S. 574.

The defendant contends that the United States Supreme Court has "already construed the fighting words exception as being extremely narrow—effectively not utilizing the doctrine at all since 1942." On the other hand, the state argues that the federal and state fighting words doctrines are coextensive, as evidenced by *Cantwell* v. *Connecticut*, supra, 310 U.S. 296. We agree with the state.

We begin with a discussion of *Cantwell*, *Chaplinsky*'s antecedent. In *Cantwell* v. *Connecticut*, supra, 310 U.S. 300, three Jehovah's Witnesses were arrested, charged with and convicted of, inter alia, breach of the peace. The charges stemmed from their conduct in going from house to house in a neighborhood in New Haven, in which 90 percent of the residents were Roman Catholics, and, as part of a pitch for the sale of books or to obtain donations, playing a phonographic recording containing attacks on the Catholic religion. Id., 301. Our Supreme Court upheld the breach of the peace conviction of Jesse Cantwell, one of the three defendants. See id., 300. On appeal, the United States Supreme Court reversed Cantwell's conviction of breach of the peace, finding that his conduct in trying to persuade a willing listener to buy a book or to

make a donation did not constitute breach of the peace; see id., 310; especially given that there was "no showing that his deportment was noisy, truculent, overbearing or offensive." Id., 308.

In his concurrence in *Baccala*, Justice Eveleigh noted that the United States Supreme Court in *Cantwell*, nevertheless, "acknowledged the state's interest in preserving peace. . . . The court, in striking a balance between the competing interests, acknowledged that in some circumstances it is appropriate for the state to punish certain speech that tends to provoke violence, noting as follows: 'One may, however, be guilty of the offense if he commit[s] acts or make[s] statements likely to provoke violence and disturbance of good order, even though no such eventuality be intended. Decisions to this effect are many, but examination discloses that, in practically all, the provocative language which was held to amount to a breach of the peace consisted of profane, indecent, or abusive remarks directed to the person of the hearer. Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the [United States constitution], and its punishment as a criminal act would raise no question under that instrument.' . . . Thus, the United States Supreme Court acknowledged Connecticut's well established authority to regulate speech that tends to provoke violence but refined that authority to conform to federal free speech principles by permitting regulation of only profane, indecent, or [abusive] remarks likely to provoke violence. It was this principle that would become the foundation of the fighting words doctrine in *Chaplinsky*." (Citations omitted.) *State* v. *Baccala*, supra, 326 Conn. 290–91 (*Eveleigh, J.*, concurring).

As discussed in part I A of this opinion, in *Chaplinsky*, the United States Supreme Court fully recognized the "fighting words" doctrine as an exception to first amendment protections. *Chaplinsky* v. *New Hampshire*, supra, 315 U.S. 572. In defining the scope of the first and fourteenth amendments, the court in *Chaplinsky*

concluded that, "[a]llowing the broadest scope to the language and purpose of the [f]ourteenth [a]mendment, it is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any [c]onstitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." (Footnotes omitted.) Id., 571–72.

Despite its narrowing of the scope of the fighting words doctrine, the United States Supreme Court has recognized the strong interest of the state in preventing imminent and likely breaches of the peace. See *R. A. V.* v. *St. Paul*, supra, 505 U.S. 382–83 ("From 1791 to the present . . . our society, like other free but civilized societies, has permitted restrictions upon the content of speech in a few limited areas, which are 'of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.' . . . We have recognized that the 'freedom of speech' referred to by the [f]irst [a]mendment does not include a freedom to disregard these traditional limitations. . . . Our decisions since the 1960's have narrowed the scope of the traditional categorical exceptions for defamation . . . and for obscenity . . . but a limited categorical approach has remained an important part of our [f]irst [a]mendment jurisprudence." (Citations omitted.)). Moreover, contrary to the defendant's claims in the present case, the fact that the United States Supreme Court has not affirmed a fighting words conviction since 1942 does not render the doctrine essentially extinct. Indeed, in 2023 the court acknowledged that it "has not upheld a conviction under the fighting-words doctrine

in [eighty] years" but, nevertheless, did not discard the doctrine. *Counterman* v. *Colorado*, 600 U.S. 66, 77 n.4, 143 S. Ct. 2106, 216 L. Ed. 2d 775 (2023).

In light of the foregoing, we conclude that federal precedent does not support the defendant's claim that the fighting words doctrine is so exceedingly narrow that it essentially has become extinct.

4

Next, we address precedents from our sister states. The defendant asserts that "our sister states are moving away from the fighting words doctrine" and cites recent cases from Vermont, Colorado, and Oregon to support his position. See *People in the Interest of R.C.*, 411 P.3d 1105, 1110 (Colo. App. 2016), cert. denied, Docket No. 16SC987, 2017 WL 5664821 (Colo. November 20, 2017); *State* v. *Harrington*, 67 Or. App. 608, 613–16, 680 P.2d 666, review denied, 297 Or. 547, 685 P.2d 998 (1984); *State* v. *Tracy*, 200 Vt. 216, 237, 130 A.3d 196 (2015). Of the defendant's proffered precedent, only Oregon courts do not follow the fighting words doctrine under the state constitution. In its appellate brief, the state, citing *State* v. *Baccala*, supra, 326 Conn. 285 (*Eveleigh*, *J.*, concurring), aptly notes that, with the exception of Oregon, other jurisdictions continue to adhere to the fighting words doctrine and that Oregon's constitutional approach is incompatible with Connecticut's *Geisler* analysis.[29] We agree with the state that it is more per-

[29] In particular, Justice Eveleigh explained: "The Oregon Supreme Court has concluded that its constitutional expressive rights provision forecloses the enactment of any law written in terms directed to the substance of any opinion or any subject of communication, unless the scope of the restraint is wholly confined within some historical exception that was well established when the first American guarantees of freedom of expression were adopted and that the guarantees then or in 1859 [when the Oregon Bill of Rights was adopted] demonstrably were not intended to reach. *State* v. *Robertson*, 293 Or. 402, 412, 649 P.2d 569 (1982). Applying this test, the Oregon Court of Appeals held a harassment statute under which the defendant had been convicted for calling another person a fucking nigger to be unconstitutional because using abusive language was not a historical exception to speech rights at the time of ratification of the Oregon constitution. . . . *State* v.

suasive that all but one of our sister states continue to recognize the fighting words doctrine under their state constitutions.

The defendant first points to a statement of the Vermont Supreme Court that, "in this day and age, the notion that *any* set of words are so provocative that they can reasonably be expected to lead an average listener to immediately respond with physical violence is highly problematic." (Emphasis in original.) *State* v. *Tracy*, supra, 200 Vt. 237. Despite expressing uneasiness over the fighting words doctrine, the Supreme Court of Vermont upheld the constitutionality of that state's disorderly conduct statute, noting that, "if [the statute] has any continuing force, it is necessarily exceedingly narrow in scope. The use of foul language and vulgar insults is insufficient. A likelihood of arousing animosity or inflaming anger is insufficient. The likelihood that the listener will feel an impulse to respond angrily or even forcefully is insufficient. The provision only reaches speech that, in the context in which it is uttered, is so inflammatory that it is akin to dropping a match into a pool of gasoline." Id. This sentiment is similar to the one expressed by our Supreme Court in *Liebenguth*, in which the court acknowledged the demanding standard for fighting words but upheld the defendant's conviction of breach of the peace in the second degree because he had used language "akin to dropping a match into a pool of gasoline." (Internal quotation marks omitted.) *State* v. *Liebenguth*, supra, 336 Conn. 708. Further, the Vermont Supreme Court has previously determined that its state constitution does not afford a more expansive free speech right than the federal constitution. See *State* v. *Read*, 165 Vt. 141, 156, 680 A.2d 944 (1996). Thus, we

---

*Harrington*, [supra, 67 Or. App. 610, 615–16]. *Harrington* concluded that the *Chaplinsky* standard employed a balancing test to determine whether speech was protected, whereas the Oregon constitution prohibited restricting the right to speak freely on *any subject whatever*. . . . Id., 614." (Emphasis in original; footnote omitted; internal quotation marks omitted.) *State* v. *Baccala*, supra, 326 Conn. 284–85 (*Eveleigh, J.*, concurring).

find the defendant's argument about Vermont precedent unpersuasive.

We similarly find unavailing the defendant's reliance on Colorado precedent. In *People in the Interest of R.C.*, supra, 411 P.3d 1107, a juvenile was charged with violating Colorado's disorderly conduct statute after he used the mobile application Snapchat to hand draw an ejaculating penis on the photograph of another juvenile while at school. Id., 1106. At trial, the juvenile argued that his drawing constituted protected speech because only fighting words are prohibited under the statute and the altered photograph did not qualify as fighting words. Id., 1107. The trial court found that the altered photograph amounted to fighting words because "its display would tend to make the subject of the photo feel humiliated and ashamed" and it insinuated that the other juvenile "was gay," which, the court found, would likely provoke the average person to respond with violence. Id., 1110. The Colorado Court of Appeals disagreed, concluding that "the mere insinuation that a person is gay" does not amount to fighting words; id.; and "that the suggestion of homosexuality or homosexual conduct is [not] so shameful and humiliating that it should be expected to provoke a violent reaction from an ordinary person." Id. Accordingly, because "the circumstances surrounding [the juvenile's] display of the photograph [did] not support the finding that the display was likely to lead to immediate violence," the Court of Appeals reversed his conviction. Id., 1111, 1113. Thus, as occurred in Vermont, the Colorado Court of Appeals upheld the validity of the fighting words doctrine under its state constitution, even though the doctrine did not apply to the conduct in question. See id., 1111 ("[U]nder the circumstances presented in this case, [the juvenile's] display of the photo did not amount to fighting words because it was not likely to incite an immediate breach of the peace. We certainly have not foreclosed the possibility that, under other circumstances, references to a person's sexual orientation might indeed rise to the level of fighting words."). Because Colorado still recognizes

the fighting words doctrine under its state constitution, we find the defendant's argument concerning Colorado precedent unpersuasive.

Finally, we likewise find the defendant's argument related to Oregon precedent unpersuasive. In *State* v. *Harrington*, supra, 67 Or. App. 615–16, the Oregon Court of Appeals held that the fighting words doctrine was "not an historical exception that was well established when first American guarantees of freedom of expression were adopted" and, thus, was unconstitutional under its state constitution. Specifically, the Oregon Court of Appeals found that Oregon territorial legislation enacted before its constitutional free speech provisions were ratified lacked any indication that "fighting words" would be prohibited. Id., 614. Oregon courts consistently recognized invitations to fight as criminal but found that "[t]he distinction between challenging another to fight a duel with deadly weapons and publicly insulting another by abusive or obscene words likely to provoke a violent or disorderly response is the difference in the intent of the actor." Id. This led the Oregon Court of Appeals to conclude that the requisite intent to "harass, annoy or alarm" was unconstitutional because it was directed at the speech itself, not toward preventing fights. Id., 615.

As Justice Eveleigh explained in his concurrence in *Baccala*, "[t]he Oregon approach is inapposite to determining the protections afforded by the Connecticut constitution because that state employs a different analytic approach to delineating the scope of state constitutional provisions. The Oregon approach is a mechanistic, single-factor approach that focuses solely on statutory substantive criminal law extant contemporaneously with ratification of its constitution. Connecticut, by relying upon the *Geisler* factors, embraces a 'structured and comprehensive approach to state constitutional interpretation' . . . . *Connecticut Coalition for Justice in Education Funding, Inc.* v. *Rell*, 295 Conn. 240, 272 n.26, 990 A.2d 206 (2010). This multifactor approach provides a more extensive [tool kit] to fashion appropriate, principled

constitutional rules. See also *Honulik* v. *Greenwich*, 293 Conn. 641, 648, 980 A.2d 845 (2009) (noting that factors are 'to be considered in construing the contours of our state constitution so that we may reach reasoned and principled results as to its meaning')." *State* v. *Baccala*, supra, 326 Conn. 284–85 (*Eveleigh*, *J.*, concurring). Moreover, whereas the Oregon constitutional analysis seeks precise expressions of historical exceptions, Connecticut's *Geisler* analysis favors a more contextual approach that contemplates the historical constitutional setting and the debates and values of the framers. See *State* v. *Linares*, supra, 232 Conn. 385–86. Because our research indicates that all states, except for Oregon, continue to recognize the fighting words doctrine, we conclude that this factor weighs in favor of the state.

5

Next, we consider the fifth *Geisler* factor, historical insights into the intent of the constitutional framers. The defendant argues that the only preconstitutional statutes that served as a basis for our modern breach of the peace statute are "limited to speech that directly challenges another to engage in a physical altercation or lawless action" and "not mere name-calling." The defendant further contends that "the fighting words doctrine, as developed in *Chaplinsky*, had no preconstitutional counterpart in Connecticut prior to 1818," as the pre-1818 statutes limited only speech that was threatening or defamatory, or that "directly called someone to combat" or "called for God to take divine vengeance upon someone." As a result, the defendant argues, "this factor weighs in favor of broader protection of free speech and a finding that the Connecticut constitution provides broader protection for offensive speech than the 'fighting words' doctrine does, because the Connecticut constitution . . . criminalizes [only] true threats and imminent lawless action."

On the other hand, the state contends that our state constitutional framers valued a balance between individual freedoms, including free speech, against the order

afforded by government, as evidenced by the qualifying language of article first, §4, of the Connecticut constitution. The state asserts that "Connecticut has always employed an expressive liberties test that balances freedom of speech against its impact on the rights of other members of society," which is consistent with the fighting words doctrine set forth in *Chaplinsky*. According to the state, "[t]he qualified character of article first, §§4 and 5 [of the Connecticut constitution], and the framers' refusal to afford complete immunity to the expression of 'opinions' can be traced back to the similarly qualified nature of the general liberties afforded to Connecticut's early colonial citizenry." We agree with the state.

"[R]atification era constitutional law is not the sole source of state constitutional principles. Indeed, the common law provides valuable insight to inform our understanding of constitutional principles. See E. Peters, [supra, 53 Alb. L. Rev. 264] ('In defining and enacting constitutional bills of rights, state and national constituencies would, of course, have drawn [on] the experience of the common law. . . . Just as the precepts of the common law influence the style of constitutional adjudication in [common-law] courts, so common law case law itself is part of our "usable past." ')." *State* v. *Baccala*, supra, 326 Conn. 276 (*Eveleigh*, *J.*, concurring). As discussed previously in this opinion, our state incorporated the English common-law offense of libel because it "tends to create ill-blood, and cause a disturbance of the public peace." *State* v. *Avery*, supra, 7 Conn. 269. Further, "Chief Justice Zephaniah Swift included the common-law offense of provocation to breach of the peace in the second volume of his digest [of the state's laws] published in 1823. See 2 Z. Swift, [supra] pp. 340–41. At the very least, Connecticut common law embraced the principle that speech that tended to cause a breach of the peace was illegitimate, even if it did not acknowledge such conduct as a basis for criminal liability. Indeed, this very rationale undergirds the fighting words doctrine. See *Chaplinsky* v. *New Hampshire*, supra, 315 U.S. 573 (noting that it is within domain of state power to punish 'words likely

to cause a breach of the peace').” (Footnotes omitted.) *State* v. *Baccala*, supra, 277 (*Eveleigh*, *J.*, concurring).

Our framers ratified our first state constitution in 1818 after Chief Justice Swift led the call for a constitutional convention to codify the freedoms that Connecticut recognized across its statutes and common law. See W. Horton, The Connecticut State Constitution (2d Ed. 2012) pp. 12, 24. Connecticut’s framers often referenced the social compact theory,[30] which “posits that all individuals are born with certain natural rights and that people, in freely consenting to be governed, enter a social compact with their government by virtue of which they relinquish certain individual liberties in exchange for the mutual preservation of their lives, liberties, and estates.” (Internal quotation marks omitted.) *Moore* v. *Ganim*, 233 Conn. 557, 598, 660 A.2d 742 (1995).[31]

The text of much of Connecticut’s individual rights set forth in article first, §4, of the Connecticut constitution was taken verbatim from the Mississippi constitution of 1817. W. Horton, supra, p. 54. The constitutional convention debates reflect some hesitancy in including the qualifying language, “being responsible for the abuse of that liberty,” but this provision ultimately was included. Id. The constitutional convention debates surrounding

---

[30] Article first, §1, of the Connecticut constitution provides: “All men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive public emoluments or privileges from the community.”

Connecticut jurists used the state constitution as a vehicle to memorialize “general statements of equal justice” and left many rights “scattered among the statutes at appropriate places.” C. Collier, “The Connecticut Declaration of Rights Before the Constitution of 1818: A Victim of Revolutionary Redefinition,” 15 Conn. L. Rev. 87, 93–94 (1982). As such, jurists viewed the common law as “more than judicial precedent and case law; it included the natural law as well.” Id., 94.

[31] Chief Justice Swift was a strong proponent of the social compact theory. In his leading treatise on Connecticut’s founding, he wrote: “A slight observation of human nature, will demonstrate that the remarks which Tacitus, and Voltaire have made respecting the Romans, and the English, are applicable to all nations. *That they can neither bear total servitude, or total liberty*.” (Emphasis in original; footnotes omitted.) 1 Z. Swift, supra, p. 31.

free speech were limited, but perhaps the most insightful remark came from William Bristol, a representative from New Haven,[32] when he stated: "Every citizen has the liberty of speaking and writing his sentiments freely, and it should not be taken away from him; there [is] a very great distinction between taking away a privilege, and punishing for an abuse of it—to take *away* the privilege, is to prevent a citizen from speaking or writing his sentiments—it is like appointing censors of the press, who are to revise before publication—but in the other case everything may go out, which the citizen chooses to publish, though he shall be liable for what he *does* publish."[33] **(Emphasis in original.)** Id. This statement in particular is compelling evidence that our framers valued a balance between individual liberties and order under the social compact theory.

Despite the clear indication that the framers of our state constitution valued public peace and criminalized certain speech or acknowledged causes of action related thereto, the defendant in the present case limits his analysis to statutes that criminalize true threats and invitations to fight. The defendant contends that, because Connecticut courts have rejected originalist approaches to our state constitution, the fighting words doctrine is unconstitutional under the preferred approach. Despite this, the defendant reads early Connecticut statutes with a focus on the specific language used rather than the framers' overall values and intentions. See *Palka* v. *Walker*, 124 Conn. 121, 123–24, 198 A. 265 (1938) (focusing analysis on framers' intent in drafting individual rights provisions of Connecticut constitution). According to the defendant, there are no historical

---

[32] See Journal of the Proceedings of the Convention of Delegates Convened at Hartford, August 26, 1818 (1901) p. 8.

[33] Our Supreme Court noted in *Cologne* that "[a] broader proposal which prohibited the molestation of any person for his opinions on any subject whatsoever was considered at the [1818 constitutional] convention but rejected." *Cologne* v. *Westfarms Associates*, supra, 192 Conn. 64 n.9.

indicators that fighting words are not protected under our state constitution.

The defendant points to the following three statutes that preceded the adoption of the 1818 constitution, which he claims served as the basis for our modern breach of the peace statute, as evidence that the fighting words doctrine had no counterpart in Connecticut prior to 1818: (1) "An Act to prevent the practice of Duelling,"[34] (2) "An Act against breaking the Peace,"[35] and (3) "An Act against profane Swearing and Cursing."[36] According to the defendant, this claim is supported by the fact that these statutes limited only speech that was "threatening . . . defamatory . . . directly called someone to combat or . . . called for God to take divine vengeance upon someone," but not "mere name-calling." The defendant also contends that "[a] review of these statutes underscores that any state constitutional exception to free speech for fighting words should be limited to speech that directly challenges another to engage in a physical altercation or lawless action." We disagree with these contentions.

First, we are not persuaded that these statutes support a determination that the fighting words doctrine has no historical roots in Connecticut. As Justice Eveleigh noted in his concurring opinion in *Baccala*, "the United States Supreme Court [in *Cantwell* v. *Connecticut*, supra, 310

---

[34] Public Statute Laws of the State of Connecticut (1808) tit. LIII, § 1, p. 241, punished "challeng[ing] the person of another, or . . . accept[ing] any such challenge to fight at sword, pistol, rap[i]er, or other dangerous weapons . . . ."

[35] Public Statute Laws of the State of Connecticut (1808) tit. CXXV, § 1, p. 545, punished "disturb[ing], or break[ing] the peace, by tumultuous and offensive carriages, threatening, traducing, quarrelling, challenging, assaulting, beating, or striking any other person . . . ."

To "traduce" is to "expose to shame or blame by means of falsehood and misrepresentation." Merriam-Webster's Collegiate Dictionary, supra, p. 1666.

[36] Public Statute Laws of the State of Connecticut (1808) tit. CLVI, § 1, p. 639, punished "sinfully and wickedly curs[ing] any person . . . ." The meaning of "curse" in 1808 was "to wish evil to another person, in the sense of calling down divine wrath upon that person." M. Margulies, "Connecticut's Free Speech Clauses: A Framework and an Agenda," 65 Conn. B. J. 437, 442 (1991).

U.S. 296] acknowledged Connecticut's *well established* authority to regulate speech that tends to provoke violence but refined that authority to conform to federal free speech principles by permitting regulation of only profane, indecent, or abuse remarks likely to provoke violence. *It was this principle that would become the foundation of the fighting words doctrine* in *Chaplinsky*." (Emphasis added.) *State* v. *Baccala*, supra, 326 Conn. 290–91 (*Eveleigh*, *J.*, concurring). We agree with Justice Eveleigh that, "[a]t the very least, Connecticut common law embraced the principle that speech that tended to cause a breach of the peace was illegitimate, even if it did not acknowledge such conduct as a basis for criminal liability. Indeed, this very rationale undergirds the fighting words doctrine. See *Chaplinsky* v. *New Hampshire*, supra, 315 U.S. 573 (noting that it is within the domain of state power to punish 'words likely to cause a breach of the peace')." (Footnote omitted.) *State* v. *Baccala*, supra, 277 (*Eveleigh*, *J.*, concurring). Furthermore, the fighting words doctrine does not apply only to "name-calling," as the defendant suggests, but embraces some of the very types of speech against which these statutes were designed to protect.

We are equally unpersuaded that our state constitution should be construed as permitting criminal punishment of fighting words only if a defendant directly invites a fight or challenges another to a physical altercation. We agree with Justice Eveleigh's conclusion that, "under [our] state constitution, speech directly challenging the listener to a fight is not a necessary element of the fighting words doctrine. Rather, the standard is whether the speech at issue is so abusive that it would provoke an ordinary person to respond with immediate violence." *State* v. *Baccala*, supra, 326 Conn. 299 (*Eveleigh, J.*, concurring).

For these reasons, and taking into account the context of the social compact theory and the framers' debates and

values, we conclude that the fifth *Geisler* factor weighs in favor of the state.

### 6

Finally, we address the sixth *Geisler* factor, which concerns "economic and sociological, or public policy, considerations." *State* v. *Linares*, supra, 232 Conn. 379. The defendant advances three arguments under this factor, namely, that **(1)** " 'evolving standards of decency' " favor reworking the fighting words doctrine, as today's society presents more opportunities than ever to speak one's mind without fear of violence or retaliation, **(2)** other avenues of relief, such as social consequences or civil actions, remove the need for criminalizing fighting words, and **(3)** the fighting words doctrine "creates a special risk of being applied in a discriminatory manner because the police, prosecutor, and court must engage in stereotyping in order to convict." The state counters by arguing that the fighting words doctrine is limited to preserving public peace.[37] We address the defendant's arguments in turn.

In support of his contention that today's society offers more freedom to speak one's mind without fear of violence, the defendant relies on a case concerning the Westboro Baptist Church **(Westboro)**, a religious congregation "espousing the belief [that] God is punishing America due to its sins, particularly its tolerance of homosexuality." *Phelps-Roper* v. *Koster*, 713 F.3d 942, 946 (8th Cir.

---

[37] We note that the state argues that other "liberal democracies" that give speech more restrictive treatment regularly have high rankings of being the happiest and least corrupt countries, and that this demonstrates that "a liberal democracy's health and vibrancy are not inherently dependent upon the adoption of libertarian free speech doctrine, thereby alleviating concern about possible ramifications stemming from an interpretation of our state constitution in the instant matter that merely maintains the status quo regarding the 'fighting words' doctrine." In making this argument, however, the state recognizes that some of the restrictions on speech in such countries "would plainly be struck down as unconstitutional" in the United States and that "this court cannot interpret our state constitution in such a manner that would clearly run afoul of binding United States Supreme Court precedent concerning the federal constitution." We, therefore, find this argument unavailing.

2013). Westboro garnered attention when its members began picketing in a peaceful manner near the funerals of American soldiers. Id.; see *Snyder* v. *Phelps*, supra, 562 U.S. 448 ("The church frequently communicates its views by picketing, often at military funerals. In the more than [twenty] years that the members of Westboro . . . have publicized their message, they have picketed nearly 600 funerals."). During those pickets, Westboro's members displayed signs with vile messages such as, "'God Hates Fags,'" "'Thank God for Dead Soldiers,'" and "'Priests Rape Boys' . . . ." *Phelps-Roper* v. *Koster*, supra, 946. No actual violence occurred as a result of the picketers' messages. As a result of the protests, the legislature of the state of Missouri enacted a funeral protest law that banned picketing and protest activities within 300 feet of any location at which a funeral is held. Id., 947. The plaintiff, Shirley Phelps-Roper, a Westboro member, subsequently brought a declaratory judgment action concerning the scope and constitutionality of the new law, which the federal District Court found to be unconstitutional. Id., 947 and n.2. On appeal, the United States Court of Appeals for the Eighth Circuit agreed, concluding that Phelps-Roper's speech was entitled to constitutional protection because it was doubtful that her words were "'inherently likely to provoke violent reaction . . . .'" Id., 948; see id. ("[i]n truth, there have been few to no reported instances of violence associated with Westboro's 500 protests at military funerals, undercutting the notion [that] Phelps-Roper's protests are likely to cause an average addressee to fight" (internal quotation marks omitted)). Specifically, the court stated that it found the lack of violence at Westboro protests, the lack of evidence indicating that Phelps-Roper intended to incite violence, and that Westboro's protests concerned matters of public importance to be compelling evidence that Phelps-Roper's speech did not amount to fighting words. See id. Notably, however, in its analysis the court recognized the fighting words doctrine, stating that "a [s]tate may punish those words which by their very utterance inflict injury or tend to incite an immediate

breach of the peace."[38] (Internal quotation marks omitted.) Id. *Phelps-Roper*, therefore, does not advance the defendant's argument.

The defendant further contends that, "[r]egardless of emotional and psychic harm, modern civility has changed, and it is less likely for a person to respond with violence now than in the past"; therefore, he contends that this "antiquated" doctrine does not comport with Connecticut's constitutional free speech provisions. (Emphasis omitted.) In support of this argument, the defendant cites the majority opinion in *Baccala*, which found that "public discourse has become more coarse. [I]n this day and age, the notion that *any* set of words are so provocative that they can reasonably be expected to lead an average listener to immediately respond with physical violence is highly problematic." (Emphasis in original; internal quotation marks omitted.) *State* v. *Baccala*, supra, 326 Conn. 239. Our Supreme Court later noted in *Liebenguth*, however, that "[t]o whatever extent public discourse in general may have coarsened over time . . . it has not eroded to the point that the racial epithets used in the present case are any less likely to provoke a violent reaction today than they were in previous decades." (Citation omitted.) *State* v. *Liebenguth*, supra, 336 Conn.

---

[38] In fact, the court in *Phelps-Roper* noted that the broad prohibition in Missouri's statutes regulating "*all* 'picketing and protest activities' around funerals—not merely those pickets involving fighting words . . . pose[d] significant problems because the statutes unquestionably reach protected expression. See, e.g., [*Houston* v. *Hill*], 482 U.S. 451, 465, 107 S. Ct. 2502, 96 L. Ed. 2d 398 (1987) ('This . . . ordinance, however, is not narrowly tailored to prohibit only disorderly conduct or fighting words[.]'); *Gooding* v. *Wilson*, [supra, 405 U.S. 523] ('Our decisions since *Chaplinsky* have continued to recognize state power constitutionally to punish "fighting" words under carefully drawn statutes not also susceptible of application to protected expression.'). For instance, Missouri's statutes are unlike that in Maryland, which specifically prohibits speech 'that is likely to incite or produce an imminent breach of the peace,' Md. Code Ann., Criminal Law, § 10-205 (b) (2011), or that in Virginia, which prohibits disruptions of funerals with speech which 'has a direct tendency to cause acts of violence by the person or persons at whom, individually, the disruption is directed,' Va. Code Ann. § 18.2-415 (B) (ii) (2006)." (Citations omitted; emphasis in original.) *Phelps-Roper* v. *Koster*, supra, 713 F.3d 948–49.

709. Thus, we find unavailing the defendant's argument that public discourse has become so coarse that listeners are unlikely to respond to vile racial slurs with violence.

Next, the defendant contends that alternative avenues for relief, such as social consequences and private lawsuits, eliminate the need to criminalize fighting words. Specifically, the defendant argues that, because this type of language carries heavy social consequences, such as the ending of friendships and the loss of business relationships, and a private person can initiate a civil action, criminalization "should not be the first response to offensive language." We do not agree.

In *Snyder*, the United States Supreme Court held that, despite ample evidence of the plaintiff's emotional distress to support his claim for intentional infliction of emotional distress resulting from picket signs held by the defendants during his son's funeral, he could not recover tort damages from the defendants because their speech, which involved a matter of public concern, was protected under the first amendment. See *Snyder* v. *Phelps*, supra, 562 U.S. 456 ("The record makes clear that the applicable legal term—'emotional distress'— fails to capture fully the anguish Westboro's choice added to [the plaintiff's] already incalculable grief. But Westboro conducted its picketing peacefully on matters of public concern at a public place adjacent to a public street. Such space occupies a 'special position in terms of [f]irst [a]mendment protection.'").

We also disagree that creating a real likelihood of immediate violence can be deterred solely through social consequences or civil actions. The defendant does not present any authority that social consequences can compensate for the state's strong interest in protecting public peace and safety. Instead, the defendant argues that we should find the fighting words doctrine unconstitutional because it requires the court to stereotype speakers and addressees, which is better handled outside of criminal court. That claim notwithstanding, we cannot conclude that this outweighs the government's strong interest in

preserving public peace and safety, which has been recognized by the United States Supreme Court. See *State* v. *Baccala*, supra, 326 Conn. 290 (*Eveleigh, J.*, concurring) (citing *Cantwell* v. *Connecticut*, supra, 310 U.S. 311). Additionally, the fighting words doctrine strikes a proper balance between "individual expressive liberties and the responsibility not to abuse such liberties." *State* v. *Baccala*, supra, 279 (*Eveleigh, J.*, concurring). As the state notes in its appellate brief, the fighting words doctrine is already an extremely narrowly defined "regulation on certain incendiary speech," the "slight social value" of which "is clearly outweighed by the social interest in order and morality." (Internal quotation marks omitted.)

Finally, the defendant argues that "the fighting words doctrine creates a special risk of being applied in a discriminatory manner because the police, prosecutor, and court must engage in stereotyping to convict," and that the lack of clarity in the doctrine "creates an even greater risk that people in minority communities may be arrested, prosecuted, and convicted due to police, prosecutors, and judges engaging in harmful stereotyping." This, the defendant asserts, is contrary to Connecticut's "significant interest in protecting minority communities from harmful stereotyping."

The defendant also relies on Justice Ecker's concurrence in *Liebenguth* to support his position. Specifically, Justice Ecker expressed concerns that the fighting words "doctrine . . . confers or withdraws constitutional protection depending on the demographic characteristics of the relevant individuals" and that "part of the constitutional analysis is an assessment of the *addressee's* physical abilities and aggressive tendencies . . . ." (Emphasis in original.) *State* v. *Liebenguth*, supra, 336 Conn. 736–37 (*Ecker, J.*, concurring). Justice Ecker found one of the fundamental problems with the doctrine, as it has been applied in Connecticut, to be that it "invites—even requires—stereotyping on the basis of age, gender, race, and whatever other demographic characteristic the adjudicator explicitly or implicitly relies to decide whether

a person is likely to respond to offensive language with immediate violence"; id., 737; and, thus, "'contains an obvious invitation to discriminatory enforcement . . . .'" Id., 743. These concerns are consistent with those expressed by Justice Kahn in her separate concurrence in *Liebenguth*, in which she stated that "[c]onsidering the stereotypes associated with immutable characteristics of the addressee . . . produces discriminatory results 'because . . . application [of the fighting words doctrine] depends on assumptions about how likely a listener is to respond violently to speech'"; id., 723–24 (*Kahn, J.*, concurring); and "essentially requires courts to promulgate stereotypes on the basis of race, gender, age, disability, ethnicity, and sexual orientation, among others, and has led to much of the scholarly criticism of the fighting words exception."[39] Id., 724; see also C. Calvert, "Taking the Fight Out of Fighting Words on the Doctrine's Eightieth Anniversary: What 'N' Word Litigation Today Reveals About Assumptions, Flaws and Goals of a First Amendment Principle in Disarray," 87 Mo. L. Rev. 493, 537–41 (2022) (discussing concerns raised by Justice Kahn and Justice Ecker in concurring opinions in *Liebenguth*).

We, as well, are troubled by the stereotyping that necessarily occurs when the fighting words doctrine, as currently formulated by the United States Supreme Court, is applied under the federal constitution, which increases the potential for discriminatory enforcement. And, although "we must adhere to the fighting words doctrine until the United States Supreme Court says otherwise" in the context of claims raised pursuant to the federal constitution, these public policy concerns bear on our determination of whether fighting words are protected under our state constitution. See *Miller* v. *Johnson*, 515 U.S. 900, 920, 115 S. Ct. 2475, 132 L. Ed. 2d 762 (1995) ("[t]here is a 'significant state interest in

---

[39] See, e.g., C. Carlson & T. Buchan, "Fighting Words: A Women's Issue?" 29 Comm. L. & Policy 129, 131 (2024) (addressing whether and how gender influences court's "analyses of the likelihood that a victim of potential fighting words will respond with immediate violence").

eradicating the effects of past racial discrimination' "); *Thibodeau* v. *Design Group One Architects, LLC*, 260 Conn. 691, 706, 802 A.2d 731 (2002) ("there exists a general public policy in [Connecticut] to eliminate all forms of invidious discrimination").

Aside from the concerns regarding stereotyping and the potential for discriminatory enforcement, we agree with Justice Eveleigh that deterring speech that constitutes fighting words "does not limit the freedom of expression but rather, the breach of the peace statute, as limited by the fighting words doctrine, fosters freedom of expression. See *State* v. *Weber*, 6 Conn. App. 407, 416, 505 A.2d 1266 ('[t]he public policy inherent in [the breach of the peace] statute is not to prevent the free expression of ideas, but to promote a peaceful environment wherein all human endeavors, including the free expression of ideas, may flourish'), cert. denied, 199 Conn. 810, 508 A.2d 771 (1986). . . . [T]he fighting words doctrine strikes the appropriate balance. It permits the state to regulate speech that is so abusive and hurtful that it will provoke an immediate violent response, while protecting harsh but less hurtful speech that has cognizable expressive value." (Citations omitted; footnote omitted.) *State* v. *Baccala*, supra, 326 Conn. 295–96 (*Eveleigh*, *J.*, concurring). As Justice Eveleigh explained: "To begin with, abusive language and epithets are not entirely harmless expression. Indeed, there is certain speech that does more than just offend sensibilities or merely cause someone to bristle. One commentator has observed the following about abusive language: 'Often a speaker consciously sets out to wound and humiliate a listener. He aims to make the other feel degraded and hated, and chooses words to achieve that effect. In what they accomplish, insults of this sort are a form of psychic assault; they do not differ much from physical assaults, like slaps or pinches, that cause no real physical hurt. Usually, the speaker believes the listener possesses the characteristics that are indicated by his humiliating and wounding remarks, but the speaker selects the most abusive form of expression to impose

the maximum hurt. His aim diminishes the expressive importance of the words.' . . . K. Greenawalt, 'Insults and Epithets: Are They Protected Speech?' 42 Rutgers L. Rev. 287, 293 (1990); see also *Taylor* v. *Metzger*, [supra, 152 N.J. 503] ('"The experience of being called 'nigger,' 'spic,' 'Jap,' or 'kike' is like receiving a slap in the face. The injury is instantaneous."'). 'It is precisely because fighting words inflict injury that they tend to incite an immediate breach of the peace. Fighting words cause injury through visceral aggression and by attacking the target's rights. Individuals who are injured in this way have a strong tendency to respond on the same level, even though that response may itself be wrongful.' . . . S. Heyman, 'Righting the Balance: An Inquiry into the Foundations and Limits of Freedom of Expression,' 78 B.U. L. Rev. 1275, 1372 (1998)." *State* v. *Baccala*, supra, 294–95 (*Eveleigh*, *J.*, concurring).

Accordingly, we find that the public policy factor weighs only in part in favor of the defendant's position that our state constitution should and does protect fighting words.

7

To summarize, we conclude that the *Geisler* factors do not support the defendant's theory that the fighting words doctrine is incompatible with the protections afforded under the Connecticut constitution. Connecticut has historically recognized a strong interest in keeping public peace and safety. The language of article first, § 4, of the Connecticut constitution requires speakers to bear responsibility for the abuse of free speech privileges. Further, beginning with colonial precedent, Connecticut jurisprudence consistently has supported the state's strong interest in keeping public peace and safety. Indeed, one of the earliest federal precedents related to the fighting words doctrine came from Connecticut. The defendant's reliance on Oregon case law and recent statements from our Supreme Court justices in concurring opinions does not persuade us that the framers of our state constitution intended to allow individuals to say

hurtful and vile things and take no legal responsibility when those words are likely to incite an immediate violent reaction by an ordinary person. On the contrary, our "state's constitution expressly contemplates holding a citizen responsible for the abuse of expressive liberty. See Conn. Const., art. I, §4. . . . [T]his state has historically embraced a civil libertarian philosophy that is permissive of government regulation of the abuse of expressive liberties when such abuse tends toward a breach of the peace." *State* v. *Baccala*, supra, 326 Conn. 297 (*Eveleigh*, *J.*, concurring). "[T]he Connecticut constitution does not demand that citizens should be forced to bear extreme personal denigration—abuse that pushes a person to the brink of violence—so that others may freely employ wanton vilification as a form of expression." Id., 299.

Furthermore, although public policy considerations regarding stereotyping and the potential for discriminatory enforcement under the fighting words doctrine weigh in favor of the defendant's position, we are not convinced that those public policy concerns, when considered in connection with all of the *Geisler* factors, support a determination that the Connecticut constitution protects fighting words. This is especially so in light of the state's strong interest in protecting peace and public safety, long-standing Connecticut jurisprudence punishing speech that amounts to fighting words, and the recent application of the fighting words doctrine in the first amendment context in *Liebenguth*. Therefore, we conclude that the *Geisler* factors do not support the defendant's contention that the broader protections for speech under the state constitution extend to fighting words.

II

The defendant next claims that §53a-181 (a) (5) is unconstitutionally vague on its face and as applied to the facts of this case. The defendant did not raise these claims before the trial court and, therefore, seeks review of his unpreserved claims pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40. As stated previously in this

opinion, "[u]nder *Golding*, a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: **(1)** the record is adequate to review the alleged claim of error; **(2)** the claim is of constitutional magnitude alleging the violation of a fundamental right; **(3)** the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and **(4)** if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; internal quotation marks omitted.) *State* v. *Benson*, supra, 235 Conn. App. 603.

We conclude that the record is adequate for review of the defendant's claims that § 53a-181 (a) (5) is unconstitutionally vague on its face and as applied to this case; see *State* v. *Indrisano,* 228 Conn. 795, 800–801, 640 A.2d 986 (1994) (for record to be adequate for appellate review of claim that statute is facially vague, record must reflect that defendant was convicted under statute in question, and with respect to claim that statute is vague as applied, record must further reflect conduct that formed basis of defendant's conviction); and that the claims are of constitutional magnitude. See *State* v. *Billings*, supra, 217 Conn. App. 24 n.15 (claim "asserting a violation of the defendant's right to freedom of speech . . . is of constitutional magnitude" (internal quotation marks omitted)). We, thus, proceed to the third prong of *Golding*—whether the defendant has demonstrated the existence of a constitutional violation—keeping in mind that, "[w]hen assessing the constitutionality of a statute, we exercise de novo review and make every presumption in favor of the statute's validity. . . . We are also mindful that legislative enactments carry with them a strong presumption of constitutionality, and that a party challenging the constitutionality of a validly enacted statute bears the heavy burden of proving the statute unconstitutional beyond a reasonable doubt . . . ." (Internal quotation marks omitted.) Id., 26. Moreover, we also "take into account any prior interpretations that [our Supreme Court] [and this court] . . . have placed on

the statute," and we "may also add interpretive gloss to a challenged statute in order to render it constitutional. In construing a statute, the court must search for an effective and constitutional construction that reasonably accords with the legislature's underlying intent." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Indrisano*, supra, 805–806.

## A

The defendant first claims that §53a-181 (a) (5) "is unconstitutionally vague on its face because the fighting words doctrine no longer provides clear guidance as to what conduct" is prohibited. Specifically, he contends that "the fighting words doctrine has become increasingly convoluted and case-specific," as "[i]t does not provide a fair warning of what is prohibited," and that the test for fighting words has become too subjective, rendering the statute devoid of a core meaning. In other words, according to the defendant, "a reasonable person would need to guess at the meaning of the terms to understand what kind of conduct the legislature intended to proscribe." We disagree.[40]

"A statute . . . [that] forbids or requires conduct in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process. . . . Laws must give a person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly. . . . A statute is not void for vagueness unless it clearly and unequivocally is unconstitutional, making every presumption in favor of its validity. . . . [T]he void for vagueness doctrine embodies two central precepts: the right to fair warning of the effect of a governing statute . . . and the guarantee against standardless

---

[40] We note that the defendant has raised his vagueness challenge to the statute pursuant to the federal constitution rather than our state constitution. Accordingly, this court is "bound by applicable United States Supreme Court precedents regarding the vagueness principle" and is "not free to interpret the federal constitution so as to recognize greater rights than the United States Supreme Court has specifically refrained from recognizing." *State* v. *Indrisano*, supra, 228 Conn. 802.

law enforcement. . . . If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inherent vagueness, for [i]n most English words and phrases there lurk uncertainties. . . . References to judicial opinions involving the statute, the common law, legal dictionaries, or treatises may be necessary to ascertain a statute's meaning to determine if it gives fair warning. . . . Thus, even [a] facially vague law may . . . comport with due process *if prior judicial decisions have provided the necessary fair warning* and ascertainable enforcement standards. *State* v. *Ares*, 345 Conn. 290, 303–304, 284 A.3d 967 (2022); see also *State* v. *Charles L.*, 217 Conn. App. 380, 395–96, 288 A.3d 664, cert. denied, 346 Conn. 920, 291 A.3d 607 (2023)." (Emphasis added; internal quotation marks omitted.) *State* v. *Russo*, 221 Conn. App. 729, 749 n.16, 303 A.3d 279 (2023), cert. denied, 348 Conn. 938, 307 A.3d 273 (2024); see also *State* v. *Caracoglia*, 134 Conn. App. 175, 180, 38 A.3d 226 (2012) ("[A] penal statute [must] define [a] criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. . . . [I]n order to surmount a vagueness challenge, a statute [must] afford a person of ordinary intelligence a reasonable opportunity to know what is permitted or prohibited . . . and must not impermissibly [delegate] basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." (Internal quotation marks omitted.)).

"A statute is not unconstitutional merely because a person must inquire further as to the precise reach of its prohibitions." (Internal quotation marks omitted.) *State* v. *Michael R.*, 346 Conn. 432, 457, 291 A.3d 567, cert. denied,    U.S.    , 144 S. Ct. 211, 217 L. Ed. 2d 89 (2023). "[O]ur case law makes clear that the statute at issue need only give fair warning to those who are potentially subject to it. . . . To that end, [t]he proscription of the activity . . . need not be definite as to all aspects of

its scope." (Citation omitted; internal quotation marks omitted.) *State* v. *Panek*, 328 Conn. 219, 244, 177 A.3d 1113 (2018). "We examine the words of the statute and prior judicial gloss put on it to determine whether the statute gives proper notice of the conduct it proscribes so that it does not impinge on free speech rights guaranteed by the first amendment to the United States constitution." *State* v. *Caracoglia*, supra, 134 Conn. App. 181.

Section 53a-181 (a) provides in relevant part: "A person is guilty of breach of the peace in the second degree when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person . . . (5) in a public place, *uses abusive or obscene language* or makes an obscene gesture . . . . For purposes of this section, 'public place' means any area that is used or held out for use by the public whether owned or operated by public or private interests." (Emphasis added.) As explained by our Supreme Court in *Liebenguth*, for an appellate court to determine whether language that is "no doubt 'abusive' under the commonly understood meaning of that term . . . is entitled to constitutional protection . . . we apply the judicial gloss necessary to limit the reach of the breach of the peace statute to ensure that it comports with constitutional requirements. See *State* v. *Baccala*, supra, 326 Conn. 234, 251 (placing gloss on § 53a-181 (a) (5) to avoid possibility of conviction founded on constitutionally protected speech). For present purposes, 'the constitutional guarantee of freedom of speech requires that [§ 53a-181 (a) (5)] be confined to language [that], under the circumstances of its utterance, constitutes [unprotected] fighting words—those [that] by their very utterance inflict injury or tend to incite an immediate breach of the peace.' . . . 'Accordingly, to establish the defendant's violation of § 53a-181 (a) (5) . . . in light of its constitutional gloss, the state was required to prove beyond a reasonable doubt that the defendant's words were likely to provoke an imminent violent response' under the circumstances in which they

were uttered." (Citation omitted.) *State* v. *Liebenguth*, supra, 336 Conn. 697–98.

This court previously rejected a vagueness challenge to § 53a-181 (a) (5) in *State* v. *Caracoglia*, 78 Conn. App. 98, 826 A.2d 192, cert. denied, 266 Conn. 903, 832 A.2d 65 (2003), in which the defendant raised a nearly identical claim as the one raised in the present case, namely, that § 53a-181 (a) (5) "has become unconstitutionally vague," as the " 'fighting words' " judicial gloss "creates an inherent ambiguity about the meaning of 'the use of abusive or obscene language in a public place' . . . ." Id., 105. The defendant in *Caracoglia* also asserted that "our courts have introduced confusion into the definition of fighting words under Connecticut's breach of the peace statute [in that it] fails to provide notice of what conduct is proscribed under subdivision (a) (1) as opposed to (a) (5) . . . ." (Internal quotation marks omitted.) Id., 108. This court rejected those arguments and concluded, on the basis of the language of the statute, that "the distinction that may be drawn between the 'fighting words' as contemplated under subdivision (1) and those under subdivision (5) can be found 'under the totality of the circumstances,' as expressed in [*State* v. *Szymkiewicz*, supra, 237 Conn. 618–22],[41] which gives rise to the use of the words. Subdivision (1) proscribes fighting words uttered in a violent, tumultuous or threatening manner . . . whereas subdivision (5) proscribes fighting words that tend to induce immediate violence by the person or persons to whom the words are uttered because of their raw effect. *The core meaning of subdivision (5) remains*

---

[41] In *Szymkiewicz*, our Supreme Court addressed the issue of whether § 53a-181 (a) (1), the subdivision of the breach of the peace statute that applies to a person who "[e]ngages in fighting or in violent, tumultuous or threatening behavior in a public place," proscribes only physical conduct or whether it also includes speech that constitutes fighting words. *State* v. *Szymkiewicz*, supra, 237 Conn. 614. The court concluded that "[s]ubdivision (1) of § 53a-181 (a) proscribes speech that properly can be characterized as fighting words when, under the totality of the circumstances, that speech amounts to 'violent, tumultuous or threatening behavior' that portends violence, while subdivision (5) proscribes 'abusive or obscene language.' " Id., 622.

*intact*; fighting words may arise in different contexts not confined to abusive or obscene language. We therefore must conclude that § 53a-181 (a) (5) is not unconstitutionally vague." (Citation omitted; emphasis added; footnote added.) *State* v. *Caracoglia*, supra, 109–10.

In light of this court's decision in *State* v. *Caracoglia*, supra, 78 Conn. App. 109–10, we reject the defendant's facial vagueness challenge to § 53a-181 (a) (5). "[I]t is axiomatic that one panel of this court cannot overrule the precedent established by a previous panel's holding . . . ." (Internal quotation marks omitted.) *State* v. *White*, 215 Conn. App. 273, 304–305, 283 A.3d 542 (2022), cert. denied, 346 Conn. 918, 291 A.3d 108 (2023). This court in *Caracoglia* specifically found that § 53a-181 (a) (5) has a core meaning and that the statute is not unconstitutionally vague. See *State* v. *Caracoglia*, supra, 110–11. The defendant's claims to the contrary, thus, necessarily fail. Moreover, the defendant has not referred to *Caracoglia* in his appellate briefs or made any attempt to distinguish it.

Furthermore, the defendant's facial vagueness challenge fails in light of the judicial gloss courts apply to § 53a-181 (a) (5), which necessarily limits "the reach of the breach of the peace statute to ensure that it comports with constitutional requirements." *State* v. *Liebenguth*, supra, 336 Conn. 698. This court and our Supreme Court have applied that judicial gloss numerous times since the statute's inception. It appears that the defendant would like this court to conduct a new analysis and place a new gloss on the statute, which we decline to do, as we are bound to apply the fighting words doctrine as currently formulated by the United States Supreme Court and as applied by our Supreme Court.[42] See footnote 17 of this

[42] In his principal appellate brief, the defendant asserts that our Supreme Court's "latest decision in *Liebenguth* only served to further confuse and tangle the already confusing doctrine by prohibiting the words 'fucking nigger' by looking at the case-specific context and 'a host of factors' that do not provide clear guidance." He further contends that "[a] defendant cannot be expected to make the same analysis as the court did in *Liebenguth* in order to know whether or not his speech

opinion; see also *State* v. *Liebenguth*, supra, 725 (*Ecker, J.*, concurring).

We acknowledge that the defendant's argument concerning the fact-specific and subjective nature of the fighting words doctrine and how that has the potential to affect the adequacy of notice of what is prohibited is not entirely without merit. Indeed, Justice Ecker expressed similar concerns in his concurring opinion in *Liebenguth*. Specifically, Justice Ecker found one of the fundamental problems with the fighting words doctrine to be "that such an intensely contextualized, fact-specific, and inherently subjective analysis in the area of free speech creates major constitutional concerns under due process vagueness principles."[43] *State* v. *Liebenguth*, supra, 336 Conn. 743 (*Ecker, J.*, concurring). Because the defendant in *Liebenguth* did not challenge § 53a-181 (a) (5) on vagueness grounds, however, Justice Ecker did not determine "whether the statute is saved by [our Supreme Court's] narrowing construction, which limits its coverage to fighting words as [our Supreme Court has] defined that term . . . ." Id., 744–45. He noted, however, that the majority opinion in *Liebenguth* has "not made that future task any easier"; id., 745; and, ultimately, "agree[d] with the majority that, *under our current first amendment case law*," the words spoken by the defendant in *Liebenguth* under the circumstances in that case "fit

is protected." For the reasons stated in this opinion and because we are bound by *Liebenguth*, we reject these arguments.

[43] In light of what he described as the untenable nature of the fighting words doctrine, Justice Ecker urged the United States Supreme Court to adopt "a more sensible first amendment framework"; *State* v. *Liebenguth*, supra, 336 Conn. 725 (*Ecker, J.*, concurring); observing that our Supreme Court's "own recent experience applying the fighting words doctrine, as well as the many similar cases adjudicated by state courts around the country, powerfully illustrates why the United States Supreme Court should consider fashioning a more defensible and administrable first amendment framework for deciding when the government may criminalize the kind of hate speech uttered by the defendant in the present case." Id., 745–46.

the bill" as fighting words. (Emphasis added.) Id., 746 (*Ecker, J.*, concurring).

Likewise, in the present case, in light of the judicial gloss applied to § 53a-181 (a) (5), which our Supreme Court in *Liebenguth* confirmed "limit[s] the reach of the breach of the peace statute to ensure that it comports with constitutional requirements"; id., 698; we cannot conclude that the statute is unconstitutionally vague. Although this precise issue was not before the court in *Liebenguth*, its statements surrounding the judicial gloss applied to § 53a-181 (a) (5) and its application of the gloss to conclude that the speech at issue in that case constituted fighting words within the meaning of the statute, lead us to conclude that the gloss sufficiently limits the reach of the statute so as to be consistent with constitutional requirements, which include fair notice of what is prohibited. For that reason, we cannot conclude that § 53a-181 (a) (5) is unconstitutionally vague when interpreted in the context of the judicial gloss as currently formulated by the United States Supreme Court and as applied by our Supreme Court. In light of our determination, the defendant has not established the existence of a constitutional violation pursuant to *Golding* with respect to his facial vagueness claim. Accordingly, the defendant's unpreserved facial vagueness challenge to § 53a-181 (a) (5) fails.

B

We now turn to the defendant's unpreserved claim that § 53a-181 (a) (5) is unconstitutionally vague as applied to the facts of this case. Specifically, the defendant claims that **(1)** § 53a-181 (a) (5) is unconstitutionally vague as applied because he did not have "fair warning to know what is prohibited," and **(2)** "the law does not provide explicit standards to law enforcement officials, judges,

and juries so as to avoid arbitrary and discriminatory application . . . ."[44] We disagree.

"The proper test for determining [whether] a statute is vague as applied is whether a reasonable person would have anticipated that the statute would apply to his or her particular conduct. . . . The test is objectively applied to the actor's conduct and judged by a reasonable person's reading of the statute. . . . If the language of a statute fails to provide definite notice of prohibited conduct, fair warning can be provided by prior judicial opinions involving the statute . . . or by an examination of whether a person of ordinary intelligence would reasonably know what acts are permitted or prohibited by the use of his common sense and ordinary understanding." (Internal quotation marks omitted.) *State* v. *Mansfield*, 201 Conn. App. 748, 758, 243 A.3d 822 (2020), cert. denied, 336 Conn. 910, 244 A.3d 561 (2021). "To demonstrate that

---

[44] The defendant also claims that, if § 53a-181 (a) (5) is found to be constitutional as applied, "it will create a 'chilling' effect that will lead citizens to steer 'far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked.'"

We conclude that the defendant has failed to brief this claim adequately and, accordingly, decline to review it. " 'We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited.' . . . . 'Claims are inadequately briefed when they are merely mentioned and not briefed beyond a bare assertion. . . . Claims are also inadequately briefed when they . . . consist of conclusory assertions . . . with no mention of relevant authority and minimal or no citations from the record . . . .'" (Citation omitted.) *State* v. *Roberts*, 227 Conn. App. 159, 185–86, 320 A.3d 989, cert. granted, 350 Conn. 915, 324 A.3d 792 (2024). The defendant's briefing for this claim consists of one short paragraph that contains conclusory assertions about the alleged "chilling effect" on "other people's expression" resulting from his conviction in this case. Aside from a single citation to a law review article for the proposition that speech is a precious but fragile right, the defendant provides no authority or legal analysis regarding this claim. Therefore, we decline to address this claim.

[a statute] is unconstitutionally vague as applied to him, the [defendant] therefore must . . . demonstrate beyond a reasonable doubt that [he] had inadequate notice of what was prohibited or that [he was] the victim of arbitrary and discriminatory enforcement." (Internal quotation marks omitted.) Id., 757–58.

In the present case, the defendant first argues that he was not provided with fair warning that his use of racial epithets toward a multiracial individual is prohibited by §53a-181 (a)(5). The defendant correctly asserts that, as the fighting words doctrine has evolved over the years, our courts have recognized that public discussion has become coarser. Indeed, public discussion has become so coarse that our Supreme Court has found some of the most vile insults not to be fighting words under the totality of the circumstances. See *State* v. *Baccala*, supra, 326 Conn. 236, 256 (defendant's reference to store manager as " 'fat ugly bitch' " and " 'cunt' " did not constitute fighting words); see also *State* v. *Parnoff*, 329 Conn. 412–13 (*Kahn, J.*, concurring in the judgment). Despite this evolution, in *Liebenguth*, which was decided in 2020—nearly three years before the circumstances underlying the present case—our Supreme Court stated that "[t]o whatever extent public discourse in general may have coarsened over time . . . it has not eroded to the point that the racial epithets used in the present case are any less likely to provoke a violent reaction today than they were in previous decades." *State* v. *Liebenguth*, supra, 336 Conn. 709. Significantly, the language at issue in *Liebenguth*—" 'fucking niggers' "—is substantially similar to the words uttered by the defendant in the present case, namely, " 'stupid nigger,' " which undermines the defendant's claim that he had no notice "that his speech was not protected speech."[45]

To be clear, our Supreme Court in *Liebenguth* did not hold, nor are we holding in the present case, that the

[45] We find unavailing the defendant's contention that his speech "was more akin to the *protected* speech in *Baccala* than the speech in *Liebenguth*." (Emphasis in original.)

mere utterance of the word "nigger" by itself, despite its vile and reprehensible nature, is sufficient to fall outside the protection of the first amendment. The words at issue must be examined in the context in which they were uttered for a court to determine whether they were likely to provoke an imminent, violent reaction. Again, the defendant takes issue with that standard, arguing that it requires "a defendant to have a crystal ball to see into the future in order to determine if his speech is likely to produce a violent reaction." For the reasons already stated herein, we are not at liberty to change or discard the standard. With respect to the present case, we conclude, in light of *Liebenguth*, that a reasonable person in the defendant's position would have anticipated that §53a-181 (a)(5) would prohibit the uttering of the words "stupid nigger" to a multiracial person, repeatedly and in a loud manner in a confined space in which the speaker blocked the only exit for the addressee while shouting the racial epithet. See *State* v. *Mansfield*, supra, 201 Conn. App. 758.

The defendant also suggests that this court should follow a decision of the Michigan Court of Appeals, which "found that a city ordinance banning 'indecent, insulting, immoral or obscene conduct in any public place' did not give adequate forewarning that referencing a person by a racial slur . . . may rise to the level of fighting words." See *People* v. *Barton*, 253 Mich. App. 601, 607, 659 N.W.2d 654 (2002). This claim requires little discussion. Connecticut Supreme Court precedent—*Liebenguth*—construed the same statute at issue in the present case, §53a-181 (a)(5), to similar words and concluded that the words "fucking niggers" were fighting words under the circumstances in which they were uttered. See *State* v. *Liebenguth*, supra, 336 Conn. 708. That decision, in which our Supreme Court noted that the word " 'nigger' " "has been characterized as 'the most provocative, emotionally-charged and explosive term in the [English] language" in light of its inextricable link to " 'racial hatred and bigotry' " and its " 'degrading and humiliating' " nature; id., 705; governs our analysis and

resolution of this claim and provides adequate warning that referring to a person with a racial slur can constitute fighting words. With binding precedent from our state's highest court, we need not look to the courts of other states for guidance concerning this issue.

The defendant next argues that the law does not provide explicit standards to law enforcement officials, judges, and juries to avoid arbitrary and discriminatory application. To establish his claim that § 53a-181 (a) (5) is unconstitutional as applied to him due to arbitrary and discriminatory enforcement, the defendant must demonstrate "that [*he* was] the victim of arbitrary and discriminatory enforcement." (Emphasis added; internal quotation marks omitted.) *State* v. *Mansfield*, supra, 201 Conn. App. 758. In the present case, the defendant, instead, discusses the general dangers inherent in the statute's vagueness, in that "judgment can vary widely across different legal actors," and, he speculates, without any authority, that "it is entirely likely that [he] would not have been arrested by a different police officer called to the scene, would not have been prosecuted by a different prosecutor in a different courthouse, and would not have been convicted by a different judge." Speculation and conjecture are not sufficient to establish the existence of a constitutional violation. See generally *Breton* v. *Commissioner of Correction*, 330 Conn. 462, 470, 196 A.3d 789 (2018) ("mere speculation or conjecture . . . will not suffice to establish a violation of the [e]x [p]ost [f]acto [c]lause" of federal constitution (internal quotation marks omitted)). Therefore, the defendant's claim that the statute is vague because it has been applied to him in an arbitrary manner fails.

To establish his claim that § 53a-181 (a) (5) is unconstitutionally vague as applied to him, the defendant had to "demonstrate beyond a reasonable doubt that [he] had inadequate notice of what was prohibited or that [he was] the victim of arbitrary and discriminatory enforcement." (Internal quotation marks omitted.) *State* v. *Mansfield*, supra, 201 Conn. App. 757–58. On the

basis of our analysis, we conclude that the defendant has failed to meet that burden. Accordingly, because the defendant has not demonstrated that §53a-181 (a) (5) is unconstitutionally vague as applied to him, he has failed to demonstrate the existence of a constitutional violation for purposes of the third prong of *Golding* as to this aspect of his vagueness claim.

The judgment is affirmed.

In this opinion the other judges concurred.